**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Tyrone Langford et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) Case No. CV-18-7041 (LDH) (RER) |
| v. | ) |
| | ) **DEFENDANTS' REPLY RULE 56.1** |
| International Union of Operating Engineers | ) **STATEMENT** |
| Local 15 et al. | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**OBJECTIONS TO PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56.1
STATEMENT AND REPLIES TO ADDITIONAL FACTS ALLEGED THEREIN**

Defendants set forth the following objections to certain procedurally improper assertions in Plaintiffs' Rule 56.1 Statement (ECF No. 50-1), as well as replies to statements of additional fact that Plaintiffs incorrectly characterized as responses. Defendants reserve the right to further respond to all aspects of Plaintiffs' Rule 56.1 Statement during summary-judgment briefing, to the extent permitted by Fed. R. Civ. P. 56 and this Court's rules. Defendants note that Plaintiffs frequently mischaracterize the record, but Defendants generally do not address those mischaracterizations of the record unless they constitute additional facts that were not separately alleged. Defendants also do not address the materiality (or lack thereof) of facts set forth in Plaintiffs' responses unless those responses are otherwise objectionable.

**General Objection:** Plaintiffs preface their Rule 56.1 Statement with a claim that "Plaintiffs reserve the right to submit any available evidence in response to defendants' intended motion for summary judgment permitted by the Federal Rules of Civil Procedure. Plaintiffs cannot make a final determination of what evidence may be needed to oppose defendants' motion until the motion itself is served." ECF No. 50-1 at 1. Throughout their Rule 56.1 Statement, Plaintiffs

similarly state that all undisputed facts are "Not disputed for purposes of this pre-motion Rule 56.1 Statement." *E.g.*, ECF No. 50-1 ¶¶ 1-5. Defendants object to Plaintiffs' refusal to state a position on whether facts are disputed for purposes of not just the pre-motion statements, but also for purposes of all summary-judgment proceedings. This Court's rules provide that "[t]he 56.1 statements submitted in connection with the pre-motion conference shall be relied upon by the Court in considering any motion for summary judgment," and that "[s]upplements to a 56.1 statement are not permitted absent just cause and leave of the Court." Judge DeArcy Hall Individual Practices, Rule III.A.6(k)-(l). Plaintiffs are bound to their Rule 56.1 Statement absent a Court order stating otherwise, and Plaintiffs' Rule 56.1 Statement should be construed as applicable to all summary-judgment proceedings, not just the pre-motion filings.

**Objections to Specific Responses and Replies to Responses that Should Have Been Set Forth as Additional Facts:** For the Court's ease of reference, Defendants reproduce Plaintiffs' entire Rule 56.1 Statement below. Most of Defendants' objections fall under one or more of the following categories:

- Plaintiffs purport to set forth facts different from those set forth in Defendants' Rule 56.1 statement but fail to cite to any supporting evidence at all. Plaintiffs therefore have failed to provide the required support for their assertions that the facts set forth in Defendants' Rule 56.1 Statement are disputed. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record..."). Defendants note these objections hereafter with "No dispute of material fact—Plaintiffs cite no record evidence."

- Plaintiffs make conclusory assertions about deficiencies in evidence cited by Defendants (such as stating that Defendants' expert, Dr. Lundquist, did not explain her conclusions).

Plaintiffs do not cite supporting evidence for these conclusions, which are contrary to the facts in the record. Plaintiffs therefore cannot "show[] that the materials cited do not establish the absence or presence of a genuine dispute." *See* Fed. R. Civ. P. 56(c)(1)(B). Defendants note these objections hereinafter with "No dispute of material fact – Plaintiffs cannot show that the materials cited are insufficient to establish an undisputed fact."

- Plaintiffs' responses rely on declaration testimony of Plaintiff Langford that is not based on personal knowledge and therefore does not set forth facts that would be admissible in evidence or show that Plaintiff Langford is competent to testify on the subjects at issue, as required by Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602. Such responses are objectionable because "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Defendants note these objections hereinafter with "No dispute of material fact—Plaintiffs cite inadmissible declaration testimony not based on personal knowledge."

- Plaintiffs' responses rely on declaration testimony of Plaintiffs' expert, Dr. Shane Thompson, that should be stricken for providing new expert analyses and/or untimely expert rebuttal testimony after the close of discovery, or for providing improper fact testimony. The grounds for striking portions of Dr. Thompson's declaration testimony are set forth more fully in Defendants' Request for a Pre-Motion Conference on a Motion to Strike Parts of Dr. Thompson's Declaration, ECF No. 51. This testimony is not material that is properly in the record, so Plaintiffs cannot rely on it to establish a dispute of fact under Fed. R. Civ. P. 56(c)(1)(A). Defendants note these objections hereinafter with "No dispute of material fact—Plaintiffs cite improper expert testimony that should be stricken."

- Plaintiffs' "responses" raise issues that are nonresponsive to the facts set forth by

3

Defendants and therefore should be deemed admissions that the facts in Defendants' Rule 56.1 Statement are not in dispute. Defendants note these objections hereinafter with "No dispute of material fact—Plaintiffs do not contest the facts set forth by Defendants."

To the extent that Plaintiffs' responses include additional facts that are not separately alleged in Plaintiffs' "Additional Disputed Facts," Defendants reply to those additional facts below as if they were separately alleged. *See* Judge DeArcy Hall Individual Practices, Rule III.A.6 ("If an opposing party chooses to include additional materials facts alleged to be in dispute, they must do so in a separately titled but consecutively numbered section.")

***

1.     Defendant International Union of Operating Engineers Local 15, 15A, 15B, 15C, 15D, 15G and 15H, AFL-CIO ("Union" or "Local 15"), is a labor organization representing workers who operate and maintain heavy construction equipment, and who perform a variety of other work in the construction industry throughout the five boroughs of New York City. ECF No. 14, Amended Complaint ("Am. Compl.") ¶ 16; Ex. 2, Christopher Thomas 30(b)(6) Deposition Transcript ("Thomas 30(b)(6) Tr.") 8:5-18; Ex. 3, Thomas Callahan Deposition Transcript ("Callahan Tr.") 22:21-24:7.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

2.     The Union consists of separate and distinct branches, which include 15-15A, 15C, and several other branches. Callahan Tr. 22:21-25:3; Thomas 30(b)(6) Tr. 12:3-11, 21:10-22:2.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

3.     Members of Local 15-15A—the branch primarily at issue in this litigation— include machine operators, machine maintenance workers, welders, gas mechanics, and others who perform work on construction sites throughout New York City. These members primarily

work on Heavy Construction projects, including subway lines, highways, public works/utilities, airports, and tunnels. Callahan 22:23-23:2; Ex. 4, Declaration of Thomas Callahan ("Callahan Decl.") ¶ 4.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

4.      From at least 2013, all of the Plaintiffs in this matter except Bentley Kennedy have been members of Local 15-15A. Ex. 6, Rupert Blackwood Deposition Transcript ("Blackwood Tr.") 16:10-14; Ex. 7, Linda Colley Deposition Transcript ("Colley Tr.") 11:11-15, 114:8-16; Ex. 8, Abraham Hyatt Deposition Transcript ("Hyatt Tr.") 12:4-6; Ex. 9, Tyrone Langford Deposition Transcript ("Langford Tr.") 11:10-21; Ex. 10, Derrick Nalty Deposition Transcript Volume I ("Nalty Tr.") 96:22-98:3; Ex. 11, Bentley Kennedy Deposition Transcript ("Kennedy Tr.") 15:9-12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

5.      Local 15-15A is a party to collective bargaining agreements with several multiemployer construction industry groups. Callahan Decl. ¶ 3. These collective bargaining agreements (CBAs) set forth terms and conditions of employment for workers performing the job duties set forth under the Agreement. *Id.*

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

6.      Signatory employers are free to hire whomever they want and in whatever manner convenient to meet their labor needs. Ex. 5, GCA CBA 2014-2018, at UNION 2850 ("Employers are at liberty to employ and discharge whomsoever they see fit, and the Employer shall at all times be the sole judge as to the work performed and whether such work performed by the Employee is, or is not, satisfactory.").

Response: Plaintiffs cannot respond to this statement because it is an interpretation of a collective bargaining agreement and not a statement of fact.

7.      Signatory employers staff projects in the following ways:

•       By recruiting and hiring workers directly. *Id*. at 2850, Blackwood Tr. 10:2-13:6, 120:17-20; Colley Tr. 126:18-21; Ex. 12, John McNamara Deposition Transcript ("McNamara Tr.") 32:9-13; Am. Compl. ¶ 29. Members of Local 15-15A are allowed to actively solicit work from any employer who is signatory to a Local 15- 15A CBA. Id. at UNION 2850, McNamara Tr. 32:9-13; Blackwood 13:8-12; Colley 43:7-11; Hyatt 41:15-42:8; Langford 43:3-6; Nalty 41:19-22; Ex. 13, Local 15-15A Referral Rules, at UNION 008687 (Rule 3); Callahan Tr. 43:25-44:15.

•       By requesting the referral of an out-of-work member through the Local 15-15A referral hall on an as-needed basis. ("The Union shall provide, when requested, qualified and skilled men to each jobsite.") Ex. 5 at UNION 2851. Blackwood Tr. 54:14-55:22; Colley Tr. 49:13-17; Hyatt Tr. 10:3-11:9; Nalty Tr. 41:17-18; McNamara Tr. 23:7-24:18.

Response: As general, broad brush statements, not disputed for purposes of this pre- motion Rule 56.1 statement.

**Defendants' Objection:** No dispute of material fact—Plaintiffs cite no record evidence. Plaintiffs should be deemed to have fully admitted Paragraph 7; their unsubstantiated characterization of the facts set forth therein as "general broad brush statements" is irrelevant.

8.      Nothing prevents contractors from retaining favored employees and keeping them in their employ from job to job. Blackwood Tr. 20:13-24:11; Colley Tr. 129:11-18; Langford Tr. 195:14-22.

Response: Disputed. The Union requires contractors and members to obtain the Union's consent to the moving of members from machine to machine or job to job. Exhibit D13, ¶¶19-20.[1]

**Defendants' Objection and Reply**: No dispute of material fact – Plaintiffs do not contest the evidence cited by Defendants and cannot show that the materials cited are insufficient to

---

[1] Plaintiffs' footnote 1 here states: "Defendants' exhibits are cited with a 'D' before the exhibit number."

establish an undisputed fact. Plaintiffs' "response" is nonresponsive to the facts set forth by Defendants and is instead an additional fact.

Defendants therefore reply that Plaintiffs do not dispute their deposition testimony but instead cite only the Union's referral rules, which they misrepresent. Rule 19 requires only that "no person *dispatched via the Referral List* will operate any machinery or equipment other than that which he was originally assigned to *on referral*, without the prior approval of Local 15." Ex. 13, Referral Rules, ECF No. 49-13 at UNION 008690. This language plainly *does not* restrict movement of members from machine to machine or job to job where those members were hired by employers directly rather than through a referral. Rule 20 likewise is limited to referrals and does not even purport to restrict an employer's right to transfer referred members, aside from same-day transfers after the start of the workday. *Id.* at UNION 008691 ("When the machine or equipment *to which a member was referred* is moved to a different job or shut down, the member must notify Local 15 immediately….The employer *shall retain its right to transfer the member who is on its payroll from one project to another project* within the jurisdiction of Local 15. However, such a transfer shall be done on a daily basis and not on an hourly basis and a member may not accept such a transfer after the contractually agreed-upon start of the work day.").

9.     There are some members, sometimes referred to as "company guys," who are favored by employers and moved from job to job to work for the same employer. Colley Tr. 129:11-24 ("Q: Do you know if they are what is sometimes called company guys or company men or company women who the employers love and take them from job to job? A: Yes, I'm aware of that. Q: You are aware that there are some of these people? A: Some."); see also Langford Tr. 210:8-211:11 ("Q: Do you know if it was the same employer…that they had previously worked? A: A couple times, they'll tell you yeah, year [sic] I worked with this company before and they –

I'm going to, they started a new job….Q: Do you know if the employer decided to bring them from job by job? A: Yes. Q: Yes, you know that? A: Yes, because they tell me. Some of them will tell you. Q: So sometimes you'll—someone will say to you this person moved with the same employer? A: Yes.").

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement except to the extent noted in response to paragraph 8.

10.    Some contractors will bring employees with them when the contractors begin work at a new job site instead of requesting referrals from the referral hall. Ex. 14, Joseph Grimshaw Deposition Transcript ("Grimshaw Tr.") 26:17-29:24 (at the LaGuardia Airport project, where Grimshaw was maintenance foreman for four years, "some contractors will come with their engineers" and when the contractors "get a contract…the said engineer will…move to the next job"); Ex. 15, Rolf Sylver Deposition Transcript ("Sylver Tr.") 30:2-23 (contractors "sometimes…bring their own with them").

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement except to the extent noted in response to paragraph 8.

11.    Plaintiffs acknowledge that contractors can and do hire employees directly without using the referral hall. Blackwood Tr. 89:5-7 ("Most of the welders, they always find jobs on their own."); Nalty Tr. 41:19-42:3 ("Q: And you are aware that members can go out and find their own jobs with a union contractor, correct? A: Sure. Q: And you're aware that many members actually do that, correct? A: Yes."); *see also* Langford 177:16-18 (members can find their own work); Hyatt 41:6-10 (same).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement except to the extent noted in response to paragraph 8. The Union requires contractors to send written requests

to the Union in order to hire a member by name. Exhibit D13, ¶5. McNamara Dep., 31:22 - 32:8.

Thomas 30(b)(6) Dep. 64:18 - -66:24.

**Defendants' Objection and Reply**: No dispute of material fact—Plaintiffs do not contest the facts set forth by Defendants. Paragraph 11 addresses jobs obtained directly by members "without using the referral hall." Plaintiffs' response cites the referral rules on requests by name that are sent to the referral hall; as such, it is not a response to Defendants' statement, but an additional fact. *See* Ex. 13, ECF No. 49-13, Referral Rules, at UNION 00868 (Rule 5). Defendants therefore reply that requests to hire a member by name are different from transferring a member from machine to machine or job to job (discussed at *supra* ¶ 8). Requests to hire a member by name from the referral hall require a written request to the Union under the Referral Rules, but those rules do not require written requests before transferring members from machine to machine or job to job, or otherwise hiring employees directly. *See* Ex. 13 at Rule 5; *see also supra* ¶ 8. The testimony Plaintiffs cite makes this clear. *See* Ex. 12, McNamara Tr. 31:22-32:13; ECF No. 50-3, O'Neill Decl. Ex. 2, Excerpts from Thomas 30(b)(6) Tr. 64:18-65:2.

12.      On occasion, contractors have hired the Plaintiffs directly without using the referral hall. Blackwood Tr. 10:2-13:8 (Blackwood has worked on and off for Trevcon, which occasionally called him starting in 2019); Hyatt Tr. 41:15-43:10 (jobs with Trevcon and Soil Solutions); Langford Tr. 39:3-40:18 (Langford worked "on and off" for William A. Gross Construction, who he would call for work).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

13.      Local 15-15A had a total of 2,420 unique active members from 2013 – 2019. Active is defined as people who were members of 15-15A, who reported hours worked, and who were

not collecting a pension and consistently redeeming fewer than 40 hours per month thereafter. Ex. 16, Expert Report of Kathleen Lundquist ("Lundquist Rep.") ¶¶ 24-25 & 25 n.2.

Response: Not disputed that Dr. Lundquist's report contains this definition. Plaintiffs cannot admit or deny the substance of this representation, because defendants did not produce documents from which this information could be determined, and Dr. Lundquist did not explain her methodology for making this determination or produce her data.

**Defendants' Objection**: No dispute of material fact – Plaintiffs cite no record evidence, and Plaintiffs cannot show that the materials cited are insufficient to establish an undisputed fact. Dr. Lundquist provided information on how she calculated active membership at Attachment D to her report. *See* Exhibit 16, ECF No. 46-16, Lundquist Rep. at Attachment D (pages 84-85). Defendants also provided a document production of supporting material for Dr. Lundquist's report to Plaintiffs at the time Defendants submitted Dr. Lundquist's report. Ex. 72, Declaration of Jennifer Simon ("2nd Simon Decl.") ¶¶ 4-6; Ex. 73, December 23, 2022 Email re Lundquist Production; Ex. 74, Dataset and Tables.R, Ex. 75, Excerpt of merged_member_data.csv. That production included a file named "Dataset and Tables.R", which shows the process that Dr. Lundquist used to create the "merged_member_data.csv" file (also produced to Plaintiffs), a spreadsheet from which Dr. Lundquist calculated membership demographic information. 2nd Simon Decl. ¶¶ 5-6, Ex. 74 at 1-7, Ex. 75.

14.     Active annual membership in Local 15-15A among Whites, Blacks and Hispanics ranged from a low of 1,616 members in 2014 to a high of 1,884 members in 2019. Lundquist Rep. ¶ 25; Callahan Tr. 23:15-17.

Response: Plaintiffs cannot respond to this statement because Lundquist's report does not explain how she distilled this information from the Union's database nor did she produce her data.

10

**Defendants' Objection**: No dispute of material fact – Plaintiffs cite no record evidence, and Plaintiffs cannot show that the materials cited are insufficient to establish an undisputed fact. As shown in Defendants' Objection to Plaintiffs' Response to Paragraph 13, Defendants produced materials showing how Dr. Lundquist calculated active membership; the same materials cited therein show how Dr. Lundquist created the spreadsheet from which she calculated active annual membership.

15.     On average, about two-thirds of active members did not sign in at the referral hall in any given year from 2013 to 2019. Lundquist Rep. ¶ 28.

Response: Not disputed that Dr. Lundquist's report contains this statement. Plaintiffs cannot admit or deny the substance of this representation, because defendants did not produce documents from which this information could be determined, and Dr. Lundquist did not explain her methodology for making this determination or produce her data.

**Defendants' Objection**: No dispute of material fact – Plaintiffs cite no record evidence, and Plaintiffs cannot show that the materials cited are insufficient to establish an undisputed fact. As shown in Defendants' Objection to Plaintiffs' Responses to Paragraphs 13 and 14, Defendants produced materials showing Dr. Lundquist's processes; the same materials cited therein show how Dr. Lundquist created the spreadsheet from which she calculated annual average percentages of members who signed in to the referral hall. Ex. 74 at 1-7 (attendance information at page 5); Ex. 75.

16.     Of the 2,420 unique active members from 2013 through 2019, nearly 50% (1,174) did not sign in at the referral hall even once during the whole period from 2013 through 2019 but did report hours worked during that time. Lundquist Rep. ¶¶ 24-25.

Response: Not disputed that Dr. Lundquist's report contains this definition. Plaintiffs cannot admit or deny the substance of this representation, because defendants did not produce documents from which this information could be determined, and Dr. Lundquist did not explain her methodology for making this determination or produce her data.

**Defendants' Objection**: No dispute of material fact – Plaintiffs cite no record evidence, and Plaintiffs cannot show that the materials cited are insufficient to establish an undisputed fact. As shown in Defendants' Objection to Plaintiffs' Responses to Paragraphs 13 through 15, Defendants produced materials showing Dr. Lundquist's processes; the same materials cited therein show how Dr. Lundquist created the spreadsheet from which she calculated annual average percentages of members who did not sign into the referral hall.

17.     The referral hall is located at 150-60 Lefferts Boulevard, South Ozone Park, Queens. Thomas 30(b)(6) Tr. 22:6-11.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

18.     It is staffed by the Local 15-15A Business Agents, who are employees of the Union. The Business Agents field Contractors' requests for engineers to perform work and "provide qualified and skilled [people] to each jobsite." Ex. 5, GCA CBA at UNION 2851; Thomas 30(b)(6) Tr. 33:19-34:5, see also id. at 27:18-30:24; McNamara Tr. 21:19-22:23.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

19.     When out-of-work members seek work through the referral hall, they come to the referral hall and register their attendance by entering their appearance on a computerized list; if seeking work for the first time after five days of employment, they also sign a paper list. Blackwood Tr. 54:22-55:22; Colley Tr. 49:18-51:3; Langford Tr. 58:15-59:11. Members receive

a reference number based on the date that they sign the paper list. Thomas 30(b)(6) Tr. 35:4- 8; McNamara Tr. 22:5-13, 23:7-24:4; Cullimore Tr. 39:21-41:13.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement, except for the statement that "Members receive a reference number based on the date that they sign the paper list." The Members themselves do not receive the number. The reference number exists only inside the Union's computer system. Langford Dec. ¶13.

20.     Members keep the same reference number until they self-report that they have worked for five days and are again unemployed. If the member wants to seek another referral from the referral hall, the member will go back to the referral hall, "re-sign" the lists, and receive a new, computer-generated reference number. Reference numbers are sequential; the higher the reference number, the more recently the member went to the referral hall seeking work. Thomas 30b6 Tr. 23:7-23; Stanton 30(b)(6) Tr. 19:10-20:3; see also McNamara Tr. 24:20-25:15; Ex. 13, Referral Rules at UNION 008689 (Rule 11).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement, except that members do not "keep" the reference number because they never had it in the first place as noted in the preceding paragraph.

21.     There are 64 different job classifications in which Local 15-15A members can obtain certifications to work. Ex. 19, Local 15-15A List of Certifications; Stanton Decl. ¶ 13.

Response: Disputed: The majority of the job performed by members do not require certifications.[2] Langford Dec.¶14. What the defendants refer to as "certifications" are at least three different categories of qualifications. First is where a certification or license is required by law.

---

[2] Plaintiffs' Rule 56.1 Statement here states in footnote 2 that: "Throughout their Rule 56.1 statement, defendants use the term 'certification' to include a license, skill or competency. Unless the distinction is material, plaintiffs will not dispute statements where defendants should have used the term 'license,' 'skill' or 'competency.'"

About 30 of the 64 classifications fall in this category. The second are competencies that are tested by the Union and which require a practical test at the Union school to obtain. Only a couple of the 64 classifications fall in this category. The third are jobs that require neither, which account for the remainder of the 64 classifications. In addition, some certifications are not job classifications. For example, a 10 hour OSHA card is a certification, but it is not a job classification. As a practical matter, every construction worker in New York City is required to have a 10 hour OSHA card, but no contractor is going to request a worker for a "10 hour OSHA card." Langford Dec. ¶15.

**Defendants' Objections and Reply**: Plaintiffs' purported "response" to Paragraph 21 is non-responsive to the actual fact Defendants set forth regarding the list of certifications that the Union keeps on file in its records. To the extent that Plaintiffs take issue with Defendants' use of the word "certifications" instead of another term, or dispute whether jobs with contractors require the certifications, Plaintiffs are alleging additional facts, not responding to Defendants' fact.

Defendants therefore reply that Plaintiffs erroneously rely on evidence that would be inadmissible at trial to the extent that they cite Paragraph 14 of Plaintiff Langford's declaration. It is undisputed that Plaintiff Langford has only 20 certifications on file with the Union. *See infra* ¶ 40. Plaintiff Langford does not explain in Paragraph 14 of his declaration or elsewhere in his declaration how he has any personal knowledge of the requirements (whether imposed by contractors, the Union, or the law) for certifications that he does not have. His discussion of the requirements for fuel handler, cherry picker, state certified welder, or excavator—certifications which he undisputedly does not have, *see id.* ¶ 40 (citing Ex. 27, ECF No. 49-27, Langford List of Certifications; Langford 17:2-19; 32:7-22)—or any other certifications that he does not have—is not admissible because it is not based in personal knowledge. *See* Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

Defendants further reply that it is undisputed that the Union keeps certifications on file; that to be referred to a job through the referral hall, members must have the certification(s) on file with the Union that are requested by the contractor; and that members not using the referral hall to obtain employment are not required to have certifications on file with the Union. *See infra* ¶¶ 22-24, 26. Plaintiffs' quibbles with the definition of "certification" and the relevance of certifications to job requirements therefore are not material.

22.     To be referred to a job through the referral hall, a member must possess the certification(s) for the type of work requested by the contractor. Langford Tr. 63:5-12; Blackwood Tr. 57:5-59:17; Colley Tr. 34:6-20.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

23.     Out-of-work members seeking employment through the referral hall are responsible for informing the Union of the certifications they possess and keeping the Union updated if their certifications change. Ex. 13, Referral Rules, at UNION 008688 (Rule 7©); Blackwood Tr. 34:21-35:11; McNamara Decl. ¶ 17.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

24.     The Union keeps certifications on file with its referral records. McNamara Tr. 70:21-23; Ex. 18, William Stanton 30(b)(6) Deposition Transcript ("Stanton 30(b)(6) Tr.") 15:17-16:2; Stanton Decl. ¶ 14.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

25.     Contractors who hire workers directly without using the referral hall can choose not to require those workers to have certifications on file with the Union. McNamara Decl. ¶¶ 19, 22.

Response: Disputed. When a certification is required by law, a contractor cannot hire a worker without the required certification.

**Defendants' Objection**: No dispute of material fact—Plaintiffs cite no record evidence and do not contest the facts set forth by Defendants. Plaintiffs do not actually dispute the substance of Paragraph 25, which addresses only whether contractors who hire workers directly must require workers "to have certifications *on file with the Union*." There is no dispute that members who do not use the referral hall do not have to have certifications "*on file at the referral hall*," and may not have updated their certifications with the Union. *See supra* ¶¶ 22-24, *infra* ¶ 26. Whether the certifications are legally required or whether contractors are permitted to disregard the requirements of the law in hiring workers are separate questions that Paragraph 25 does not address. Plaintiffs therefore should be deemed to have admitted that Paragraph 25 is undisputed.

26.     Members not using the referral hall to obtain employment are not required to have certifications on file at the referral hall. McNamara Decl. ¶ 23.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

27.     Members can practice on equipment to learn new skills or improve existing skills at the Union's Training School—which is located just across the parking lot from the referral hall and is open while the referral hall is open. Langford Tr. 36:18-37:2; Colley Tr. 25:18-28:4; Nalty Tr. 38:4-39:6.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

28.     The Training School also offers classes that members can take to learn new skills or obtain new or updated licenses. Blackwood Tr. 30:10-31:1; Colley Tr. 18:17-19:12; Nalty Tr. 40:5-41:11; Langford Tr. 21:14-22:11; Ex. 22, Declaration of Marie Sullivan ("Sullivan Decl.") ¶¶ 9, 11.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

29.     Plaintiffs acknowledge that some certifications, including lights and generator, are "easy" to obtain. Blackwood Tr. 32:4-5, 32:9-10 (generator and lights are "easy"); see also Blackwood Tr. 57:17, 59:15-16 ("anybody could operate lights"); Colley 54:15-25 ("they can call anybody" for light jobs because "anyone can flip a switch").

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

30.     Contractors are permitted to contact the referral hall to hire an individual by name. Ex. 13, Referral Rules at UNION 008688 (Rule 5); Blackwood Tr. 48:17-49:11; Nalty Tr. 47:1-4.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

31.     When contractors want to request a worker but do not name a specific individual, contractors will simply make a referral request and ask the Union to refer an operator who is certified to perform a specific type of work (such as running a bobcat or welding) to a specific job site. McNamara Tr. 23:7-24:4; Thomas 30(b)(6) Tr. 30:13-24, 33:19-34:10. For example, Union records show that on September 27, 2013, John McNamara referred Plaintiff Colley to operate a pump for Commodore Constr. Corp., Inc. at 133rd and Convent. Stanton Decl. ¶ 25; Ex. 23, Colley Referral Records.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

32.     Local 15-15A, through the referral hall, typically refers members who have the certification or certifications requested by the contractor, are present in the referral hall, and who

have the lowest computer-generated reference number, meaning they have been seeking referrals for the longest amount of time. McNamara Tr. 22:5-13, 23:7-24:4; Cullimore Tr. 39:21-41:13; Thomas 30b6 Tr. 32:9-19; Ex. 13, Referral Rules at UNION 008688 (Rule 7).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement that the Referral Rules contemplate that members in the referral hall will be referred to jobs in the order in which they appear on the out of work list. Referral Rules at UNION 008688 (Rule 7).

33.     There are multiple factors that might determine whether a member receives a referral. For example:

- Whether the contractor requested a member by name;
- The time of day of the referral;
- The time of day the member signed in at the referral hall;
- Whether the member refused the referral;
- Whether the referral request occurred when the referral hall was open or after hours;
- Whether the contractor requested more than one certification and the member did not have both.
- Whether the referral was to begin work on the same date or a future date.

Langford Tr. 84:8-15 (Plaintiff Langford refuses to work in tunnels), 87:4-21 (members must be present to receive referrals), 93:14-17 (Plaintiff Langford refuses to work in Staten Island); Thomas 30(b)(6) Tr. 83:3-84:25.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

34.     Local 15-15A maintains a database that keeps records of referrals. The database contains, among other information:

- the dates members attend the referral hall and the time of day they arrive;
- each reference number assigned and to whom;
- certifications on file for the out of work members using the hall;
- details about the referral, including the member's name, the employer, the job location, the certifications required, the day the referred member begins work;
- the type of referral (request by name, call back);
- unsuccessful attempts to refer (job cancelled, member refused job, etc.)

Stanton 30(b)(6) Tr. 13:22-16:23, 18:19-19:9, 24:8-25:5; Stanton Decl. ¶¶ 9-22.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement, without any concession as to the completeness or accuracy of the Union's database.

35.     The database contains records of over 22,000 referrals and attempted referrals between January 2013 and December 2019. Stanton Decl. ¶ 9; Lundquist Rept. ¶¶ 42-43 & Ex. 1.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

36.     Plaintiff Blackwood has 9 of the 64 certifications that members can obtain: generator, lights, oiler/service mechanic, OSHA 10-hour, OSHA 30-hour, pump, welder, welder-city certified, and welder-state certified. Stanton Decl. ¶ 14; Ex. 24, Blackwood List of Certifications; Blackwood 29:1-33:3.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

37.     Plaintiff Colley has 11 of the 64 certifications: fuel handler, generator, lights, loader, LPG, oiler/service mechanic, OSHA 10-hour, OSHA 30-hour, pump, roller, and sweeper. Stanton Decl. ¶ 14; Ex. 25, Colley List of Certifications; Colley 33:6-23.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

38.     Colley's list of certifications on file states that she has a forklift certification, but this is not accurate. Colley 33:6-14. Colley has never had a valid forklift license, although she used to operate forklifts on job sites before licenses were required by the government. Colley 17:5-18:2, 18:17-20:1; Sullivan Decl. ¶ 13. She once attempted to obtain a forklift license through a class at the Training School, but she did not pass the practical test. Colley 18:17-20:1.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

39.     Plaintiff Hyatt has 12 of the 64 certifications: generator, hazmat, lights, maintenance, oiler, OSHA 10-hour, pump, welder, welder-city certified, welder-state certified,

Amtrak, and Long Island Railroad. One of these (Amtrak) is now expired. Stanton Decl. ¶ 14; Ex. 26, Hyatt List of Certifications; Hyatt 16:7-26:10.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

40.    Plaintiff Langford has 20 certifications on file with the Union: backhoe, bobcat, demo bobcat, dozer, fine grade dozer, generator, lights, loader, oiler/service mechanic, pump, roller, SWAC, service engineer, track loader, utility backhoe, forklift, hazmat, Long Island Railroad, OSHA 10-hour, and OSHA 30-hour. Stanton Decl. ¶ 14; Ex. 27, Langford List of Certifications; Langford 17:2-19; 32:7-22.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

41.    Plaintiff Nalty has had 12 of the 64 certifications at relevant times: city MTA, generator, hazmat, lights, maintenance, oiler, OSHA 10-hour, pump, roller, Staten Island railway, and tower crane. Stanton Decl. ¶ 14; Ex. 28, Nalty List of Certifications. Due to a loss of vision in one eye, Nalty is unable to weld or to operate most equipment. Nalty 29:21-31:5, 40:7-9 ("I had this disability that I couldn't operate the machines").

Response: Not disputed for purposes of this premotion Rule 56.1 statement.

42.    None of the Plaintiffs are certified to perform work in the natural gas industry. Blackwood Tr. 38:19-39:10; Hyatt Tr. 37:15-38:21; Langford Tr. 37:3-38:6; Nalty Tr. 39:7-40:2; McNamara Decl. ¶ 15.

Response: To the extent that defendants mean that none of the plaintiffs possess the "NGA Fusing" or "National Grid Fusing" certifications, plaintiffs do not dispute for purposes of this Rule 56.1 statement.

**Defendants' Objection and Reply**: No dispute of material fact—Plaintiffs do not contest the facts set forth by Defendants. Plaintiffs do not respond to the statement that none of them are

certified to perform work in the natural gas industry and therefore should be deemed to have admitted this fact.

43.     Plaintiffs have taken a few classes at the Training School, primarily to obtain certifications or recertifications for safety training, such as OSHA 10- or 30-hour classes, HAZMAT certification, and track training for the MTA or the Long Island Railroad. Blackwood Tr. 30:10-31:1 (OSHA); Ex. 29, Blackwood Response to First Interrogatories (No. 13) (HAZMAT); Colley Tr. 37:12-38:1 (OSHA); Langford Tr. 21:14-22:10 (HAZMAT); Ex. 30, Langford Response to First Interrogatories (No. 13) (MTA track safety); Ex. 31, Nalty Response to First Interrogatories (No. 13) (HAZMAT). Plaintiff Langford took a forklift class at some point. Langford Tr. 19:19-21:13. Since 2013, Plaintiff Nalty has taken classes on rigging and crane aerial fueling. Nalty Tr. 40:5-41:7; Ex. 31, Nalty Response to First Interrogatories (No. 13).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

44.     Plaintiffs Colley and Nalty have each practiced on equipment at the Training School on one occasion since 2013. Colley Tr. 38:2-40:4 (Colley practiced for "a couple of hours" on the backhoe in 2019); Nalty Tr. 35:21-39:6 (Nalty practiced "one time" on a street sweeper but did not become proficient on it and did not return for more training).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

45.     None of the other Plaintiffs have practiced on equipment at the Training School at all since 2013. Blackwood 37:12-38:18 ("I'm a welder, I don't run equipment."); Hyatt 29:12-23, 31:4-16 (Hyatt once attempted to get training on a specific kind of pipe welding, but did not get the training because "the setup…wasn't ready when we went to get it done…so we just leave it"); Ex. 32, Hyatt Response to First Interrogatories (No. 12); Ex. 30, Langford Response to First Interrogatories (No. 12); Langford Tr. 33:15-36:12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

46.     Union records reflect that the ten certifications that were most frequently requested by contractors from 2013 to 2019 are: maintenance, pump, oiler/service mechanic, fuel handler, loader, bobcat, backhoe, cherrypicker, rubber tire excavator, and welder-state certified. Lundquist Rep. ¶¶ 37, 47-48 & Lundquist Rep. Ex. 2. Union records reflect that over 75% of the referrals from the referral hall are for these ten certifications. Lundquist Rep. ¶ 37.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement, without any concession as to the accuracy or completeness of the Union's records.

47.     Of these ten most frequently requested certifications, Plaintiff Blackwood has 3; Plaintiffs Colley and Hyatt have 4; Plaintiff Langford has 5; and Plaintiff Nalty has 2. Lundquist Rep. ¶¶ 47-48 & Ex. 2.

Response: Disputed. There are overlaps in the classifications that make this statement inaccurate. For example, although the Union's records do not reflect that Nalty has a "maintenance" certification, he has frequently been referred to jobs that are coded in the Union's records as "maintenance."

48.     Plaintiff Blackwood had the certifications needed for just 29% of the referrals for the ten most frequently requested certifications from 2013 to 2019; Plaintiff Colley had 39%; Plaintiff Hyatt had 44%; Plaintiff Langford had 42%; and Plaintiff Nalty had 25%. Lundquist Rep. ¶ 48 & Lundquist Rep. Ex. 2.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

49.     The referral hall opens at 6:00 a.m. and generally remains open until around 1:00 p.m., but Plaintiffs sometimes leave the referral hall before it closes, with Plaintiff Langford sometimes staying for just thirty minutes. Langford Tr. 88:4-14 (Langford sometimes leaves as

early as 6:30 or 7 a.m.); Blackwood Tr. 61:1-62:5 (sometimes Blackwood does not "stay there all day," and leaves early if he gets frustrated); Colley Tr. 62:4-20; Nalty 88:10-89:17 (Nalty usually leaves around 11 a.m. or 12 p.m.); see also Colley Tr. 60:18-19 (referral hall hours are "from 6:00 until 1:00").

Response: Disputed. The normal operating hours of the referral hall are Monday through Friday, from 6:00 a.m. until 10:30 a.m. Exhibit D13, ¶6.

Langford sometimes leaves "by 6:30 or 7:00" when he is told that he is so far down the list that he is not going to be called for a job. Langford Tr. 88:4-17.

Colley stays until the hall closes unless she has an appointment. Colley Tr. 62:18-20.

50.     The Union's records reflect that, since 2013, Blackwood was called for a referral but did not answer on fourteen (14) occasions; Colley on seven (7) occasions; Hyatt on eighteen (18) occasions; Langford on twenty-four (24) occasions; and Nalty on ten (10) occasions. Stanton Decl. ¶ 23; Ex. 33, Blackwood Referral Records; Ex. 23, Colley Referral Records; Ex. 34, Hyatt Referral Records; Ex. 35, Langford Referral Records; Ex. 36, Nalty Referral Records.

Response: Plaintiffs do not dispute that the Union's records contain these notations, without any concession to the accuracy of those records.

51.     Plaintiff Nalty has lived in Georgia since 2004. Nalty Tr. 7:12-9:5. After he is required to return to the bottom of the referral list for having worked five days, Nalty will return to Georgia for a few weeks, and will sometimes call the business agents to ascertain his place on the referral list before deciding when to return to New York. Nalty Tr. 48:20-50:17.

Response: Disputed. Nalty lives in both New York and Georgia. Nalty Dec., ¶2.

52.    Plaintiffs Colley and Langford have not attended the referral hall for over three years, since March 2020. Langford 10:7-19; Colley 10:3-11:4; Stanton Decl. ¶ 25; Ex. 67, Colley Referral Hall Attendance; Ex. 69, Langford Referral Hall Attendance.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

53.    Plaintiff Hyatt has attended the referral hall one time since March 2020. Stanton Decl. ¶ 25; Ex. 68, Hyatt Referral Hall Attendance.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

54.    Derrick Nalty did not visit the referral hall for two years, from March 2020 until March 2022. Nalty 11:5-21; Stanton Decl. ¶ 25; Ex. 70, Nalty Referral Hall Attendance.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement

55.    Rupert Blackwood visited the referral hall four times over the two-and-a-half- year period from March 2020 to August 2022. Stanton Decl. ¶ 25; Ex. 66, Blackwood Referral Hall Attendance.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

56.    Blackwood refuses to take jobs in tunnels. Blackwood Tr. 72:21-74:4.

Response: Disputed. Blackwood does not like to work in tunnels because he is claustrophobic, but he has worked in tunnels from time to time. He last worked in the 2nd Avenue tunnel. Blackwood Tr. 73:9-74:4.

57.    Langford refuses to take jobs in tunnels. Langford Tr. 84:8-15, 92:6-93:13; Ex. 30, Langford Response to Interrogatory No. 14.

Response: Not disputed that Langford is medically restricted from working in tunnels and therefore does not accept jobs in tunnels. Langford Tr. 92:14-16

58.     Langford refuses to take jobs in Staten Island. Langford 93:14-22, 94:13-16; Ex. 30, Langford Response to Interrogatory No. 5.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

59.     The Union's referral records show that since 2013, Plaintiff Blackwood has refused three (3) referrals; Plaintiff Colley has refused eight (8); Plaintiff Langford has refused ten (10); and Plaintiff Nalty has refused six (6). Stanton Decl. ¶ 25; Ex. 33; Ex. 23; Ex. 34; Ex. 35; Ex. 36.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement that the Union's referral records so reflect.

60.     Most of the time, Plaintiffs Blackwood, Hyatt, and Langford go to the referral hall when they are looking for job opportunities. Blackwood Tr. 46:10-48:1 ("I don't look for work nowhere else. I go to the hall."); Langford Tr. 53:10-55:17 (aside from William A. Gross, no employers have hired Langford directly without using the referral hall); Ex. 32, Hyatt First Interrogatory Responses (No. 18).

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

61.     Plaintiffs Colley and Nalty obtain all their job opportunities through the referral hall; contractors have not hired them directly. Colley 40:23-24, 49:13-17; Ex. 37, Colley First Interrogatory Responses (No. 18); Nalty 41:12-42:8.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

62.     Plaintiffs allege that they should have received referrals to the rebuilding of LaGuardia Airport ("LGA")—the only example of a "long-term job" identified in their Amended Complaint. Am. Compl. ¶¶ 44-45.

Response: Disputed. The Amended complaint alleges LGA as an example of a long term project. Am. Compl. ¶¶ 44-45.

63.     All of the Plaintiffs in fact received referrals to LGA. Plaintiff Blackwood received

nine (9) referrals to LGA, Plaintiff Colley received eight (8), Plaintiff Hyatt received four (4),

Plaintiff Langford received thirteen (13), and Plaintiff Nalty received six (6) (although he refused

two of them). Stanton Decl. ¶ 25; Ex. 23 & Exs. 33-36.

Response: Not disputed for purposes of this pre-motion Rule 56.1

64.     Langford's 2015 referral to work for Halmar at LGA turned into a job that lasted

for one year, with Halmar moving Langford between different tasks and machines, and assigning

him to work on all three shifts at various times. Langford 169:3-172:11. Langford did not have to

go to the referral hall to get work at all during this year; it was his "best job ever, one year steady."

*Id*. at 171:9-172:1.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

65.     The Business Agents rarely know and do not have any control over how many hours

may result from any given referral. McNamara Decl. ¶¶ 6-8. Blackwood Tr. 115:11-13

(acknowledging that the contractor controls the duration of a job assignment based on, among

other things, whether they are satisfied with the performance of the engineer); Tr. 116:5-8 ("Q: So

… in your experience, has there been a job that has been expected to last for many months but gets

cut short? A. Yes, yes, that happens."); Hyatt Tr. 48:17-20 ("Q: Would you agree that on types of

jobs that Local 15 members work on, it's -- it's sometimes hard to predict how long those jobs are

gonna last? A. Yeah, sometime. Yes"); Grimshaw Tr. 30:12-32:2.

Response: Disputed. Business Agents often know about how long a job will last and usually

have at least an estimate from the contractor. Langford Dec., ¶17.

**Defendants' Objection:** No dispute of material fact—Plaintiffs cite inadmissible

declaration testimony not based on personal knowledge. Paragraph 17 of Plaintiff Langford's

declaration claims that "the business agent always has an idea" about the expected length of a job. Plaintiff Langford is not a business agent and lacks personal knowledge of the business agents' states of mind.  Moreover, Plaintiffs do not dispute the key fact Defendants set forth here—that business agents *do not control the length of jobs*.

66.     If a contractor is pleased with the work of an engineer, they can move the engineer from machine to machine or job to job on a project rather than laying the engineer off at the conclusion of each assignment, thereby extending the duration of the engineer's employment. Colley Tr. 130:25-133:2; Nalty Tr. 82:12-22; Langford Tr. 169:3-172:21; Cox Tr. 30:17-32:9.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

67.     Plaintiffs' expert, Dr. Thompson, did not analyze how often the Plaintiffs were referred to jobs through the Union's referral system. Ex. 39, Shane Thompson Deposition Transcript ("Thompson Tr.") 48:11-51:9 (assignment of jobs by the Union was "implicit" in analysis but not examined directly); Lundquist Report ¶ 55; see also generally Ex. 40, Expert Report of Shane Thompson ("Thompson Rep.").

Response: It is unclear what defendants mean here by "analyze how often the Plaintiffs were referred to jobs through the Union's referral system."  If defendants mean that Dr. Thompson did not compare the number of job referrals received by plaintiffs compared to the number of hall visits, plaintiffs do not dispute that fact.

68.     Defendants' expert, Dr. Lundquist, analyzed the number of referrals received by the Plaintiffs from 2013-2019 compared to how many referrals they would be expected to receive based on how often they attended the referral hall. Lundquist Rep. ¶¶ 41-43.

Response: Plaintiffs do not dispute that Dr. Lundquist's report makes this assertion.

69.     This analysis shows that none of the Plaintiffs received statistically significantly fewer referrals than expected, and that Plaintiff Nalty received significantly more referrals than would be expected based on the number of times that he attended the referral hall. Lundquist Rep. ¶¶ 42-43.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement that this was Dr. Lundquist's finding, without any concession to the significance of the same.

70.     Dr. Lundquist also analyzed each Plaintiff's referrals for the ten certifications most frequently requested by contractors based on the certifications they hold and their visits to the referral hall. Lundquist Rep. ¶¶ 47-52; Ex. 2 and Tables 5a-5j. In many cases, one or more of the Plaintiffs did not have the certification to be referred. Lundquist Rep. ¶ 50.

Response: It is unclear exactly what defendants mean by the first sentence of this "fact." The cited paragraphs of Dr. Lundquist's report speak for themselves. As for paragraph 50 of Dr. Lundquist's report, plaintiffs do not dispute that they do not hold certifications for all job referrals.

71.     Dr. Lundquist found that for most of these top ten most frequently requested certifications held by one or more Plaintiff, "no significant differences were found in referral rates for any of the Plaintiffs." Lundquist Rept.¶ 51, Ex. 2, Table 5a-5j. Nalty received significantly more referrals than expected for the pump and oiler/service mechanic certifications. "Plaintiff Hyatt had the only comparison to reflect significantly lower referrals than expected, for Welder-State Certified." Lundquist Report ¶ 51; Exhibit 2.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement that Dr. Lundquist's report makes the assertions attributed to it.

72.     Dr. Lundquist concluded: "The pattern of predominately non-significant results with a few comparisons favoring Plaintiffs and [one] comparison[] adverse to Plaintiffs is what we

would expect if the differences were due to chance variation….and is not indicative of race as a causal factor in the results obtained." Lundquist Rept. ¶ 53.

Response: It is not disputed that this is an opinion stated by Dr. Lundquist in her report. It is not a fact.

73. The Union maintains records of termination letters from employers informing the Union that a member has been terminated for a reason other than layoff for lack of work. McNamara Decl. ¶ 29; Stanton Decl. ¶ 22.

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

74. Of Local 15-15A's entire membership, Plaintiff Langford has the second highest number of termination letters. Stanton Decl. ¶ 23.

Response: Disputed. Defendants produced "termination letters" only for plaintiffs but not for other members. O'Neill Dec., ¶2.

**Defendants' Objection**: No dispute of material fact—Plaintiffs cite no record evidence and cannot show that the materials cited are insufficient to establish an undisputed fact. Plaintiffs cite only the declaration of their attorney for the allegation that Defendants did not produce termination letters for the entire Union membership. Mr. O'Neill's declaration cannot establish a genuine dispute of material fact because the Union's IT Coordinator, William Stanton, has testified that he consulted the "Employer_Member_Stop_Referral table" in the Union's databases, which tracks termination letters the Union has received for members, and that the table shows that "[o]f all the members in Local 15-15A, Plaintiff Langford has the second highest number of termination letters on file." *See* Stanton Decl. ¶ 23. Defendants provided the "Employer_Member_Stop_Referral table" to Plaintiffs during discovery in this litigation as part of the production of the Member Daily Referral Database. *See id.* ¶¶ 8, 22. It is true that Defendants

29

produced the underlying termination letters only for Plaintiffs and not for members who are not at issue in this litigation, but that is immaterial since Defendants have produced the table on which Stanton's testimony relies.

75.     Nine different employers have informed the Union that they terminated Langford. McNamara Decl. ¶ 29; Ex. 41, Langford Termination Letters. Most recently, J. D'Annunzio and Sons wrote that Langford was unable to "follow directions and hand signals creating a safety concern" while working at LGA in 2019. Ex. 41 at Union 009733.

Response:     Not disputed for purposes of this pre-motion Rule 56.1 statement that defendants produced termination letters from nine employers for Langford.

76.     Langford was referred to a job at LGA with employer Ferreira Construction in April 2019. Langford 154:6-157:9. Ferreira terminated his employment. *Id.*

Response: Not disputed for purposes of this pre-motion Rule 56.1 Statement.

77.     The Union also received two letters from contractors—including one at LGA— describing problems with Plaintiff Colley's operation of equipment that resulted in her termination. McNamara Decl. ¶ 29. Harold Structures Joint Venture noted in July 2016 that Colley had caused damage to a loader and had operated the loader in an "unsafe" manner by coming "within inches of hitting" a laborer's head. Ex. 42, Harold Structures Letter, at UNION 9665-66. Skanska Walsh sent a letter on December 1, 2016 explaining that it had terminated Colley from LGA because Colley "did not know how to unlock the quick connect to change attachments" on her loader and caused damage to the machine. Ex. 43, Skanska Walsh Letter, at UNION 009864-65.

Response:     Not disputed for purposes of this pre-motion Rule 56.1 statement that defendants produced these letters.

78.     Plaintiffs cannot identify any evidence to support their allegation in Paragraph 88 of the Amended Complaint that "when plaintiffs are at the head of the out of work list, defendants have arranged for employers to write letters to request specific non-African American Operating Engineers for jobs for which plaintiffs are qualified, and defendants have assigned non-African American operating engineers directly to jobs for which Plaintiffs are qualified." Colley 135:21-139:10 ("Q: Do you have any facts to support this claim? A: No."); Hyatt Tr. 104:22-105:7 ("Q: Do you have any facts to support the allegation…that the union agents tell employers…names of members to write letters so that they request those people by name? A: No, no, I can't"); Blackwood Tr. 104:15-21 ("I never heard. I never, I don't know of that"); Langford Tr. 201:14-204:22 (Langford has heard agents telling employers to send request letters but has not heard that the purpose of those letters was to skip someone on the list); Nalty 61:20-63:16 ("No. I don't know anything about that.").

Response: It is not disputed that the quoted plaintiffs so testified.

79.     Plaintiff Blackwood cannot identify any specific jobs that he was denied that he should have received. Blackwood Tr. 83:13-16 ("Q: Do you recall any specific instances when you were denied a particular job that you should have received? A: No.").

Response: It is not disputed that Blackwood so testified.

80.     The only basis for Plaintiff Blackwood's claim that the Union operated its affairs to deny him a job because of his race is his claim he that often goes to the referral hall but does not receive enough referrals. Blackwood Tr. 74:12-25, 75:1-8.

Response: Disputed. Blackwood's testimony contains nothing about "the only basis for [his] claim." Blackwood Tr. 74:12-25, 75:1-8. That is a characterization.

81.     The members who are alleged by Plaintiff Blackwood to be favored by the Business Agents in the assignment of jobs consist of African American and White members. Blackwood Tr. 88:10-18.

Response: Disputed. Blackwood testified that the majority of White members are always working (Blackwood Dep., 88:7-10) and that there are some Blacks who are favorites of the business agents. *Id.*, 88:13-18.

82.     Plaintiff Blackwood has no facts to support his claim that Whites are given jobs by the Business Agent without going to the referral hall. Blackwood Tr. 89-90.

Response: Not disputed that Blackwood was unable to identify Whites that are given jobs by the Business Agent without going to the referral hall.

83.     Plaintiff Blackwood only identified an "Asian Indian" man as one of the members who he alleges receives favorable treatment from Business Agents because of his relationship with them. Blackwood Tr. 94:9-96:9.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Blackwood only identified one member by name who receives favorable treatment from Business Agents.

84.     Plaintiff Blackwood identified no individuals who Business Agents moved off of jobs in order to provide those individuals with long-term job referrals. Blackwood Tr. 107:8-111:8. He identified no specific instances where this has occurred. *Id.* at 111:5-112:20.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

85.     Plaintiff Blackwood cannot identify any instances where someone below him on the out-of-work list was referred to a job for which Blackwood was qualified. Blackwood Tr. 113:1-6.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Blackwood did not identify any such instances in his deposition.

86.    Plaintiff Colley cannot identify any specific instances where she was denied a job because of her race. Colley Tr. 123:14-124:4. She acknowledges that "I can't put my hand on a particular time. It's not something I can prove." Id. at 136:4-137:14.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Colley gave the testimony attributed to her.

87.    Plaintiff Colley has no evidence that a Union business agent assigned an engineer directly to a job; she cannot identify any members who received work in this way or any business agents who assigned work in this way. Colley Tr. 140:16-141:25.

Response: Disputed. Colley testified that she was aware of such facts but could not recall them at the time. Colley Dep., 140:9-16.

88.    Plaintiff Hyatt identified three African American members who allegedly passed him over for a job, but no white members. Hyatt Tr. 54:8-58:10, 62:6-64:23, 94:9-95:9, 113:16-114:13.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

89.    Plaintiff Langford cannot identify any specific instances where he was passed over for a job that he should have received. Langford Tr. 114:9-11 ("Q: When were you passed over for a job you should have received? A: I don't know.").

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Langford's testimony was quoted accurately.

90.    Plaintiff Langford cannot identify any individuals who receive favorable treatment from the Union in terms of job assignments. Langford Tr. 197:1-21.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Langford testified he could not name the individuals who received favorable treatment.

91.     Aside from claiming that he was passed over by an unknown individual for a rock crusher job with an unknown contractor on an unknown date, Plaintiff Nalty cannot identify any jobs for which he believes he was passed over. Nalty 74:15-77:6, 80:3-81:12 ("Q: So you believe it happened many times, but you can't specifically remember the day or the job right now that it happened? A: No, I can't.").

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

92.     Plaintiff Nalty does not know whether the Union pulls members off of jobs to send to another job in order to discriminate against African Americans. Nalty Tr. 73:7-21.

Response: Disputed. Nalty testified that he did not know whether the Union pulls members off of jobs to send to another job in order to discriminate against certain individuals. Nalty Tr. 73:18-21.

93.     Plaintiffs do not identify any specific jobs they should have received that instead went to white members.

Response: Plaintiffs cannot respond to this statement because no citation to the record was given.

94.     At the close of discovery, Defendants asked Plaintiffs in an interrogatory to "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," all Plaintiffs submitted identical responses stating that "the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants

have made sure it does not exist." Ex. 45, Blackwood June 2023 Interrogatory Responses (No. 21);

Ex. 46, Colley June 2023 Interrogatory Responses (No. 21); Ex. 47, Hyatt June 2023 Interrogatory

Responses (No. 21); Ex. 48, Langford June 2023 Interrogatory Responses (No. 21); Ex. 49,

Kennedy June 2023 Interrogatory Responses (No. 21); Ex. 50, Nalty June 2023 Interrogatory

Responses (No. 21).

Response: Disputed. Defendants misquoted the response, which states "for the most part,

the information that defendants seek in this interrogatory simply does not exist, and it does not

exist because defendants have made sure it does not exist."

95.     Plaintiff Blackwood is not aware of any occasion where the Union told an employer

to lay him off or terminate him. Blackwood Tr. 116:6-10.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

96.     Plaintiff Colley acknowledges that the employer, not the union, has the right to lay

off and fire people. Colley Tr. 111:18-112:2. With respect to one of her terminations, Colley admits

that she does not know who made the decision to lay her off; with respect to another, she alleges

that the Union sent her back to the jobsite shortly after she was terminated. Colley Tr. 102:5-14;

see also generally Colley Tr. 97:16-103:16.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

97.     At some point while Plaintiff Langford was working for William A. Gross at a job

he found himself (Langford does not know the date), business agent Andrew Cullimore visited the

job site. Langford Tr. 44:17-45:19. Within a few days of Cullimore's visit to the job site, the

superintendent from William A. Gross laid Langford off. Langford Tr. 44:10-16.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

98.    Business agents visit job sites in the course of their job duties for various reasons, including to check on contractors' compliance with CBAs, to monitor employee well-being, and to ensure that laborers or other nonunion workers are not taking Local 15 jobs. Langford Tr. 45:20-46:19.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

99.    Cullimore did not lay Langford off of the job or tell Langford that he was going to be laid off. Langford Tr. 45:4-19.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

100.    Langford does not have any facts to show that William A. Gross did not make the decision to lay him off. Langford Tr. 47:16-18.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement, other than the circumstances testified to by Langford.

**Defendants' Objection**: No dispute of material fact—Plaintiffs cite no record evidence that raises any dispute. The testimony from Plaintiff Langford that Defendants cite reads: "Q: Do you know that the employer didn't make the decision to lay you off? A: I don't know." Ex. 9, Langford Tr., ECF No. 49-9 at 47:16-18.  Plaintiffs have not cited to any other portions of Plaintiff Langford's deposition testimony.

101.    Langford worked on a forklift job for Skanska USA Civil Northeast, Inc. after being referred on October 30, 2017, Ex. 35, until business agent Robert Burns informed him at some point in November 2017 that the contractor was laying the forklift off but needed a light operator, so Langford could switch to lights on the same job. Langford Tr. 161:9-162:12. Langford alleges that the same day he was moved off of the forklift, one of Burns's family members (whose name

Langford does not know) came to the job site and replaced Langford on the forklift. Langford Tr. 162:14-164:12; Ex. 30, Langford Response to First Interrogatories (No. 8).

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

102.    Langford overheard the operator who replaced him on the forklift saying that he had come to the job site from another project with Skanska. Langford Tr. 164:13-165:4. The operator did not say how or why he moved, or at whose direction. *Id.* at 165:5-7.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

103.    Langford also alleges that after a week working in the Bronx "for the police department" in 2017, he was laid off and replaced by another engineer; he does not know who the employer was, who replaced him, or why he was replaced. Langford 166:7-167:7; Ex. 30, Langford Response to First Interrogatories (No. 8).

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

104.    Langford believes that the business agent and maintenance foreman "sabotaged" his job with Halmar at LGA and "arranged" his layoff, but he does not have any facts to support this claim. Langford Tr. 172:12-21; Ex. 30, Langford Response to First Interrogatories (No. 8).

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Langford so testified.

105.    On May 7, 2019, Plaintiff Nalty received a referral from the referral hall to work on a Halmar job located at the Horace Harding interchange of the Kew Gardens interchange project as an oiler on an excavator. See Ex. 36, Nalty Referral Records; Ex. 44, Derrick Nalty Second Deposition Transcript ("Nalty Tr. II"), 20:18-21:9. When Nalty arrived at the Kew Gardens job, there was a white oiler named Alan who was already there working on the side of the job opposite to where Nalty was assigned to work. Nalty Tr. II 21:17-22:1, 24:8-25:4; Ex. 51, Harold Clarke

37

Deposition Transcript ("Clarke Tr.") 187:13-15. While the other oiler was covering two machines, Nalty first covered one machine, then began covering a second machine. Clarke Tr. 69:12-15.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

106.    Nalty was laid off when the total number of machines was reduced to two, which would both be maintained by the other oiler who had been dispatched to the job before Nalty. Nalty Tr. II 28:19-29:16. The applicable collective bargaining agreement allows a contractor to employ a single engineer to maintain two pieces of equipment. Nalty Tr. II 35:1-5; see also Callahan Decl. ¶ 9; Ex. 52, 2018-2022 GCA CBA at UNION 002694 ("For jobs bid after July 1, 2014- Service Mechanic on excavators 60,000 lbs. and over: a Service Mechanic may maintain two (2) excavators and a combination of any two (2) pumps or light towers (i.e. either two (2) pumps, two (2) light towers or one (1) pump and one (1) light tower). The Service Mechanic may also perform maintenance duties and shall be paid at the 3(b) Maintenance Rate.").

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

107.    Nalty does not know whether the decision to lay him off came from the Union. Nalty Tr. II 27:20-21, 28:19-29:16, 55:7-9. The same oiler who was working on the job site before Nalty arrived remained on the site after Nalty was laid off. Nalty Tr. II 35:13-36:2.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

100.    Plaintiffs' expert, Dr. Shane Thompson, analyzed "out-of-order referrals" in the Local 15-15A databased "from 2013 – 2019," to determine "whether race was a factor in the out-of-order referrals." Thompson Rep. ¶¶ 43, 45.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

101.    Dr. Thompson built a model based on the following data from the Union's referral database: (1) the "sign in date" which Dr. Thompson also referred to as the "out of work date,"

which shows how long the member has been out of work; (2) the dates that engineers were present at the referral hall; (3) job referrals, which identify "the date of the referral, the contractor, and the machine operated," and (4) whether the member had the necessary certification. Thompson Rep. ¶¶ 26, 33-35.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

102. Dr. Thompson concludes that that "if there are three engineers in the hall, all of whom [have the necessary skill or certification] and the engineer with the most recent out of work date is referred to the job, that would count as two out of order referrals, because two members were passed over when the job was referred to the third engineer." Thompson Rep. ¶ 43.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

103. Dr. Thompson calculated that both Black and White engineers were subject to frequent "out of order referrals," and were "passed-over" for referrals in the model he created. He calculated that White engineers were "passed-over" 55,892 times and Black engineers were "passed-over" 20,119 times. Thompson Rep. Table 3.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

104. Dr. Thompson concludes "White engineers comprise 71.1% of hall visits, Black Engineers are 19.0%   If race were not a factor in out of order referrals, we would expect that the racial breakdown of passed-over engineers would track the population percentages." Thompson Rep. ¶ 46.

105.    Plaintiffs[3] are frequently out of work and seeking opportunities at the referral hall. Dr. Thompson calculated that Plaintiffs by themselves constituted 2.8% of all engineer visits to the referral hall from 2013 – 2019. Thompson Rep. Table 3, "Plaintiffs" Column.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

106.    Dr. Thompson found "no statistically significant difference" between the rate Plaintiffs were passed over and their number of hall visits. Thompson Rep. Table 3, Plaintiffs' Column.  In fact, Dr. Thompson found that Plaintiffs as a group were "passed-over" fewer times than expected based on their visits to the referral hall. *Id.*

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement, without any concession to the materiality of statistics of "plaintiffs as a group." Further, plaintiff limits her response to any assertion regarding the "expected" number of pass overs to the context of statistics. Plaintiff's expectation is that the Union would follow its referral rules, and therefore would not "expect" any pass overs.

**Defendants' Objection**: No dispute of material fact—Plaintiffs cite no record evidence to support their assertions about "Plaintiff's expectation" regarding pass-overs.

107.    Defendants' expert Dr. Kathleen Lundquist "agree[d] with Dr. Thompson's statement in his report that 'If race were not a factor in out of order referrals, we would expect that the racial breakdown would track the population percentages.' In fact, that is exactly what Dr. Thompson found in his analysis of the Plaintiffs as a group: no significant difference from the population percentages." Lundquist Rep. ¶ 60.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

[3] Footnote 3 of Defendants' Rule 56.1 Statement notes: "Dr. Thompson's expert report included opinions regarding Maria Sosa; the sole Plaintiff in another case Plaintiffs' counsel has filed against Local 15. Sosa v. IUOE Local 15, No. 1:20-cv-00066 (LDH) (RER). Accordingly Dr. Lundquist also considered Ms. Sosa in her expert report."

108.    Dr. Lundquist replicated Dr. Thompson's analysis and examined the experience of each Plaintiff individually. Lundquist Rep. Table 6. Three of the five plaintiffs in this case: Rupert Blackwood, Tyrone Langford, and Derrick Nalty, were "passed-over" significantly fewer times than expected based on their visits to the referral hall. *Id.*

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Lundquist reported this finding.

109.    Dr. Thompson's models did not account for any of the following variables, even though he had the data to available in the Member Daily Referral Database:

- Whether the contractor "called back" a member to a job they had recently been working;
- Whether the contractor requested a member by name;
- The time of day of the referral;
- The time of day the member signed in at the referral hall;
- Whether the member refused the referral;
- Whether the referral request occurred when the referral hall was open or after hours;
- Whether the contractor requested more than one certification and the member did not have both.
- Whether the referral was to begin work on the same date or a future date.

Thompson Tr. 25:20-27:2 (Dr. Thompson did not include or consider the request-by, job location, comment, or inserted date fields), 35:10-36:1 ("there is some uncertainty, if they showed up on the same day, who showed up first….I was unable to identify who showed up before the other…there's not a time stamp that I used of when they showed up"); Lundquist Rep. ¶ 59 (because Dr. Thompson did not consider comments, on one occasion he counted up to 45 members as "passed over" by Joan Hoge when she was referred to a job because the contractor requested a female engineer); Lundquist Tr. 81:24 – 83:13; Thompson Tr. 47:3-48:7 (acknowledging that report counted about 35 or 40 members as passed over by Joan Hoge).

Response: Disputed. According to the Declaration of William Stanton, the data field "Request_By" tracks the method by which a job was matched to a member. Stanton Dec., ¶9(h).

41

Nearly of the referrals analyzed by Dr. Thompson were coded in the "Request_By" data field as a "2" or as a "0." A "2" corresponds to a "call in," while a "0" is a non referral, mostly called no answer. Thompson Dec., ¶1.

The Union's records do not specify the time of day that a referral was made. Thompson Dec., ¶2.

The time of day of sign in was considered in the sense that if two members signed in the same day, it would not count as an out of order referral if one received a job before the other. Thompson Dec., ¶4.

Refusals were considered because they were treated as a referral. Thompson Dec., ¶5.

Referrals made after the hall closes were considered, because they are supposed to be made according to the rules that would apply if the hall were still open. Business agents are provided with a list of members who were in the hall but not referred to work. After hour referrals are supposed to be made from this list. McNamara Dep, 26:12 – 27:14.

The out of order analysis considered the certification requested. Thompson Dec., ¶6. There are no separate referral rules for jobs that are to start on a future date and the Union's database does not contain a field for such referrals. Thompson Dec., ¶7.

When Jean Hoge was assigned to as job in the example cited by defendants, at least one Black female was passed over. Thompson  Dec., ¶9.

**Defendants' Objection and Reply**: No dispute of material fact—Plaintiffs cite improper expert testimony that should be stricken, to the extent they rely on Paragraphs 2, 5, 7, and 9 of Dr. Thompson's declaration. To the extent that Plaintiffs rely on Paragraph 1 of Dr. Thompson's declaration, Defendants object that Paragraph 1 cannot be used to support any assertion that Dr. Thompson *actually considered* the "Request_By" field in his analysis of out-of-order referrals

because it would contradict Dr. Thompson's unequivocal deposition testimony that he *did not* consider the "Request_By" field. Thompson Tr. 26:5-7.

In addition, Plaintiffs' response to Paragraph 109 sets forth several statements that introduce additional facts, to which Defendants now reply:

Plaintiffs state that: "Referrals made after the hall closes were considered, because they are supposed to be made according to the rules that would apply if the hall were still open. Business agents are provided with a list of members who were in the hall but not referred to work. After hour referrals are supposed to be made from this list. McNamara Dep, 26:12 - 27:14."

Defendants Reply: In the portion of his testimony cited by Plaintiffs, John McNamara also explained that when he is working to fill after-hours referrals, "I look at my list and I call the member that whatever the classification is, I call them. If they answer, I send them…*If they don't answer, I go to the next person.*" O'Neill Decl., ECF No. 50-3, Exhibit 3 (Excerpts of McNamara Transcript) at 27:14. Because a member who does not answer their phone is not eligible for the after-hours referral, and McNamara's testimony makes clear that members do not always answer their phones, there is no basis for Plaintiffs' assertion that all after-hours referrals should be assumed to have ultimately gone to the next person on the out-of-work list. Moreover, a review of the Plaintiffs' own referral records indicates that after-hours referrals are noted in the "Comments" field of the Member Daily Referral table—a field that Dr. Thompson indisputably testified that he omitted from his analysis. *See* Thompson Tr. 26:17-19; *see also, e.g.*, Ex. 35, Langford Referral Records, ECF No. 49-35, at 4 (comment field reflecting that on 5/28/2014, Plaintiff Langford received an after-hours referral to Tutor Perini Corporation from McNamara).

Plaintiffs state that: "When Jean Hoge was assigned to as job in the example cited by defendants, at least one Black female was passed over. Thompson Dec., ¶9."

Defendants' Reply: Not material. The only Black female Plaintiff in this case, Plaintiff Linda Colley, was not present in the referral hall on January 2, 2013, and therefore was not eligible for the referral at issue. *See* Ex. 67, Colley Attendance History, ECF No. 49-67, at 1.

110.    Dr. Lundquist conducted an analysis that controls for some of the factors Dr. Thompson ignored. Lundquist Rep. ¶¶ 43, 58, 62, 63; Tables 7a – 7d.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement that Dr. Lundquist's report so claims.

111.    With respect to the time of attendance and time of referral factor, in particular, "if the member was not signed in at the hall at the time the referral went out, he or she would not be eligible for the referral in question and cannot be said to have been 'passed over'." Lundquist Rep. ¶ 62.

Response: Plaintiffs cannot respond to this statement because it is not a complete sentence. Dr. Lundquist's report appears to be quoted correctly. Plaintiffs do not dispute that the Union's referral rules state that a member must be at the referral hall to receive a referral.

112.    Dr. Lundquist's analysis "cross-referenced the sign-in times for Plaintiffs Hyatt and Colley to the referrals for which Dr. Thompson considers them to have been passed over. When we remove the referrals for which Plaintiffs Hyatt and Colley were ineligible due to their late arrival at the referral hall, Plaintiff Hyatt's pass over rate becomes non-significant and Plaintiff Colley's statistical significance drops substantially." Lundquist Rep. ¶ 63; Tables 7c and 7d.

Response: Disputed. Dr. Lundquist's report regarding this "analysis" is wholly conclusory. Her report does not explain her methodology for conducting this analysis, nor has she produced any data supporting the conclusions contained in Tables 7c and 7d. In order to conduct the analysis she describes, it would be necessary to know (a) the sign in times of the members involved and (b)

the time that the job was assigned. The Union's job referral table does not contain the time that

jobs were assigned, thus it is impossible to conduct the analysis that Dr. Lundquist reports states.

Thompson Dec., ¶2.

**Defendants' Objection:** No dispute of material fact—Plaintiffs cite improper expert

testimony that should be stricken. Moreover, Plaintiffs cannot show that the materials cited are

insufficient to establish an undisputed fact. Dr. Lundquist provided information on how she

accounted for sign-in times and what fields she used. Ex. 74 at 10-11. Dr. Lundquist concludes:

"By accounting for just one factor – sign-in time at the referral hall – five of the six plaintiffs

experience the same amount or fewer pass-overs than expected. This analysis does not support

race as a factor in the referrals for which Plaintiffs were 'passed over.'" Lundquist Rep. ¶ 64.

113.    Dr. Lundquist concludes: "By accounting for just one factor – sign-in time at the

referral hall – five of the six plaintiffs experience the same amount or fewer pass-overs than

expected. This analysis does not support race as a factor in the referrals for which Plaintiffs were

'passed over.'" Lundquist Rep. ¶ 64.

Response: Disputed for the same reasons explained in response to paragraph 112.

**Defendants' Objection**: Defendants hereby incorporate their objection to Plaintiffs'

response to Paragraph 112.

114.    Plaintiffs' expert Dr. Thompson reported findings regarding the number of times

the Plaintiffs would have to attend the referral hall in order to achieve 1,000 hours of work in a

particular year. Dr. Thompson examined differences between racial and gender groups. Thompson

Rep. ¶¶ 12-14, 58-62.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

115.     In performing this analysis Dr. Thompson reported that there were on average 2,394 Whites and 305 Non-Whites per year from 2013 to 2019, for a total population size of 2,699 individuals. In performing this same analysis he also reported that there were on average 1,719 Males and 23 Females per year across the same time period, for a total population of 1,742. Thompson Rep. pp. 4 & 15 (Tables 2 & 5).

Response: Not disputed for purposes of this Rule 56.1 Statement. Dr. Thompson explained the discrepancy in paragraph 45 of his declaration.

**Defendants' Objection:** No dispute of material fact—Plaintiffs cite improper expert testimony that should be stricken; they appear to intend to cite Paragraph 46 of Dr. Thompson's declaration, which contains new, undisclosed analysis and untimely rebuttal. (Defendants have not requested leave to move to strike Paragraph 45, but that paragraph is irrelevant to the issue discussed here).

116.     At his deposition Dr. Thompson conceded that there was no missing data on members' gender during the time period examined. Thompson Tr. 127:8-129:5.

Response: Not disputed for purposes of this Rule 56.1 Statement.

117.     Neither in his report nor at his deposition did Dr. Thompson reconcile the disparate population sizes used for the racial and gender analyses. Lundquist Rep. ¶ 64.

Response: Not disputed for purposes of this Rule 56.1 Statement. Dr. Thompson explained the discrepancy in paragraph 45 of his declaration.

**Defendants' Objection**: Defendants hereby incorporate their objection to Plaintiffs' Response to Paragraph 115 of Defendants' Rule 56.1 Statement.

118.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours is based upon an assumption that members are not able to work hours without a referral being part of the process. Thompson Tr. 51:2-5.

Response: Disputed. Dr. Thompson testified as follows: "I think it's very strongly implied that the referral process underlies the visits and, well, the work hours relating to the number of visits." Dr. Thompson was not asked to explain or expound upon his answer. Thompson Tr. 51:7-9.

119.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours is based upon an assumption "very strongly implied that that the referral process underlies … the work hours relating to the number of visits." Thompson Tr. 51:7-9.

Response: Disputed. Dr. Thompson did not characterize his testimony as an assumption.

120.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours relied on hours-worked data from those who obtained work on their own (i.e., without being referred through the referral system). Thompson Tr. 59:2-8.

Response: Disputed. Dr. Thompson testified as follows: "So if someone has solicited work on their own or received it outside of the Referral Hall during the time period but at any time during 23 -- 2013 through 2019 did come to the Referral Hall, they would be in, but it – in the dataset, but it wouldn't reflect the time they solicited their own work." Thompson Tr. 59:3- 8.

The Union does not keep any record of jobs found by members on their own, even though that information is required to be communicated to the Union. Exhibit D13, Union 8691. Furthermore, the inclusion of race neutral data should not change the results of the analysis. Thompson Dec., ¶11.

**Defendants' Objection and Reply:** Plaintiffs mischaracterize the record and cannot contest the facts set forth by Defendants. Defendants mistakenly cited a shorter portion of that testimony than intended in Paragraph 120 (citing Thompson Tr.  59:2-8) but included the full testimony in Defendants' exhibits. On the very next page (the same page of Ex. 39 that Defendants cited), Dr. Thompson clarifies that:

> it appears I may have misspoke earlier…I believe that I said that if there was someone who had no visits in a particular year, say 2015, they would not be reflected in the data. But in this case, it looks like for the seven years in question, if someone had zero visits for that particular year, they would have a zero identified for them so they'd be in that year with zero visits….Those people would be included in the dataset.

Thompson Tr. 60:1-61:9. In light of this testimony, Plaintiffs cannot dispute that Dr. Thompson's analysis considered members who never went to the referral hall.

121.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours do not differentiate between the number of hours worked by a member as a result of a referral from the hall or hours worked as a result of being hired directly by an employer. Thompson Tr. 118:2-6.

Response: Disputed. This statement contains an assumption that the hours worked in the Union's data contains hours as a result of being hired directly by an employer. The Union's records do not identify the source of the work represented by the hours contained in its data. Thompson Tr. 117: 7-11.

**Defendants' Objection and Reply:** Plaintiffs mischaracterize the record here and attempt to introduce an additional fact regarding what information is in the Union's database, but that is nonresponsive to the fact set forth by Defendants. Dr. Thompson clearly testified that he used data regarding hours worked in his analysis, which contains data on *all* work hours by Local 15-15A member regardless of whether the job was obtained through a referral or directly from the

employer; he also acknowledged that his analysis did not differentiate between hours worked as a result of a referral and hours obtained outside of the hall. Thompson Tr. 118:2-11.

122.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours relied upon work hours data for members who never visited the referral hall once from 2013-2019. Thompson Tr. 62:3-63:1.

Response: Partially Disputed. The testimony cited by defendants relates only to Table 4 of Dr. Thompson's report.

**Defendants' Objection and Reply:** Plaintiffs again mischaracterize the record. To the extent Plaintiffs attempt to distinguish Table 4 from Table 5 (which contained the visits per 1,000 hours peer analysis), that is disingenuous. *See* Ex. 40, Thompson Rep. ¶¶ 57-60 & Tables 4, 5. Dr. Thompson also testified when discussing his peer analysis that "if they made zero visits to the hall and have work hours that year, they're included in this calculation." Ex. 39, Thompson Tr. 106:1-17.

123.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours in a given year relied upon an assumption that anything "outside of the hall"— including data regarding the hiring of engineers directly by employers—is "race- neutral." Thompson Tr. 77:3-5, 106:15-21.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

124.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours in a given year do not compare the individual experience of Plaintiff Linda Colley to different race (i.e. White) peer groups. Thompson Tr. 13-16.

Response: Plaintiff cannot respond to this assertion because the portion of Dr. Thompson's transcript cited by defendants does not remotely relate to the subject matter of this statement.

49

125.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours in a given year compared the individual experience of each Plaintiff to a group of their White (for Plaintiffs Hyatt, Nalty, Langford, and Blackwood) or Male (for Plaintiffs Colley) "peers" assembled by Dr. Thompson. Thompson Rep. ¶¶ 58-61.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

126.    For an individual to be considered a peer of a Plaintiff under Dr. Thompson's framework, he or she must possess the exact set of certifications as the Plaintiff or a subset of the certifications possessed by the Plaintiff. Thompson Rep. ¶ 13.

Response: Not disputed, but a better way to articulate it is to state that none of the peers possesses a certification or skill that the plaintiff to whom he or she is compared does not possess.

127.    Additionally, for an individual to be considered a peer by Dr. Thompson, he or she must have submitted hours-worked data or attended the referral hall at least once during the period from 2013 to 2019. Thompson Tr. 60:6-63:1.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

128.    Dr. Thompson's conclusions regarding the number of hall visits required to achieve 1,000 work hours in a given year excluded peers from the analysis in any year in which the peer did not report work hours. Thompson Tr. 76:11-77:14.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

129.    The total population of the peers analyzed by Dr. Thompson consists of the following 46 individuals: Michael Abbate; Joseph Agro; Lawrence Badstein; Harold Baptiste; Joseph Bilella; Anthony Casillo; Angelo Chomlek; Vincent Cirillo; Matthew Corcoran, Carlos Costa, Andrew Davila, Alon Fernandez, Lawrence Galizia, James Giscombe, Jaroslaw Glazewski, Francisco Gomez, Christopher Grasso, Charles Guarino, Joseph Guidice, James Heal, Gilberto

Hernandez, Priscilla Ingram, Frank James, Garrick Justesen, Robert Keeley, John Kenney, Ralph Lanzetta, Marc Libretto, Sean Maroney, Ruberto Martinez, Edward McPhail, Gennaro Melisi, Bernard Mulligan, Carl Panarella, Bryan Peterson, Anthony Piazza, Vincent Planz, John Romeo, Jerome Ryan, Clement Santoro, Victor Scalici, Micheal Sferrazza, Adam Szulborski, Dimitrios Tsoukalas, John Williams, and Michael Yuelling. Ex. 1, Simon Decl. ¶ 2; Ex. 53, Thompson Peer Analysis.

Response: Disputed. The list of names include several names that are not in Exhibit 53 (Fernandez, Gomez, Hernandez and Martinez.)

130.    Harold Baptiste—an individual counted as a peer of Plaintiff Hyatt from 2013-2019—is Black. McNamara Decl. ¶ 30.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.[4]

131.    Priscilla Ingram—an individual counted as a peer of Plaintiffs Hyatt and Langford from 2013-2015—is Black. McNamara Decl. ¶ 30.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

132.    John Williams—an individual counted as a peer of Plaintiff Langford in 2013-2019—is Black. McNamara Decl. ¶ 30.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

133.    The following 27 White peers never visited the referral hall and never received a referral from 2013-2019: Joseph Bilella, Anthony Casillo, Matthew Corcoran, Andrew Davila, Alon Fernandez, Lawrence Galizia, James Giscombe, Jaroslaw Glazewski, Francisco Gomez, Christopher Grasso, Charles Guarino, Joseph Guidice, James Heal, Gilberto Hernandez, Frank James, Garrick Justesen, Ralph Lanzetta, Marc Libretto, Ruberto Martinez, Edward McPhail,

---

[4] Plaintiffs' footnote 4 here states: "Plaintiffs relied on defendants for race information. At no point did defendants supplement their discovery responses to correct misidentified races. O'Neill Dec., ¶1."

Gennaro Melisi, Carl Panarella, Anthony Piazza, John Romeo, Victor Scalici, Michael Sferrazza, and Michael Yuelling. Stanton Decl. ¶¶ 26-27.

Response: Disputed. Plaintiffs do not dispute that the 27 White peers never visited the referral hall or never received a referral from the hall that was entered into the Union's database. To the extent that defendants are stating that the 27 White peers never received a job or a job referral through the Union during the period in question, plaintiffs dispute that fact because at least one of them (Guidice) received a referral on April 17, 2017 without attending the hall that was not entered into the Union's database. O'Neill Dec., ¶8.

**Defendants' Objection and Reply**:  Plaintiffs' assertion that Guidice "received a referral on April 17, 2017 without attending the hall that was not entered into the Union's database" is an assertion of an additional fact that goes beyond Defendants' statement of facts regarding the Union's records. Defendants therefore incorporate their reply to Plaintiffs' Additional Fact ¶ 221, which addresses the same allegation regarding Guidice.

134.    The following additional eight White "peers" never received a referral from the hall at all during the relevant time period (2013-2019): Michael Abbate, Angelo Chomlek, Robert Keeley, Sean Maroney, Bernard Mulligan, Jerome Ryan, Clement Santoro, and Adam Szulborski. Stanton Decl. ¶ 28.

Response: It is not disputed that the eight White peers identified never received a referral *from the hall* during the relevant time period. At least one of them (Mulligan) received referrals directly from a business agent. O'Neill Dec., ¶7.

**Defendants' Objection and Reply**:  Plaintiffs' assertion that Mulligan "received referrals directly from a business agent" is an assertion of an additional fact that goes beyond Defendants' statement of facts regarding the Union's records of referrals through the referral hall. Defendants

therefore incorporate their reply to Plaintiffs' Additional Fact ¶ 221, which addresses the same allegation regarding Mulligan.

135.    Nalty's peers as determined by Dr. Thompson consisted of the following: Costa, Keeley and Scalici. Keeley visited the referral hall on one occasion in 2014. Neither Costa nor Scalici ever attended the referral hall between 2013 and 2019. Stanton Decl. ¶ 29.

Response: Disputed. Costa visited the referral hall on more than one occasion during the period in question and received at least one referral through the hall. Thompson Dec., ¶56.

136.    Colley's peers as determined by Dr. Thompson consisted of the following White engineers during the 2013-2019 time period: Corcoran, Costa, Davila, Giscombe, Grasso, James, Keeley, Kenney, Lanzetta, Scalici, and Sferrazza. Only Keeley and Kenney ever visited the referral hall between 2013 and 2019. Kenney visited the referral hall only twice during that period and never received a referral. Keeley visited the referral hall on only one occasion in 2014 and never received a referral. Stanton Decl. ¶ 30.

Response: Disputed. Costa visited the referral hall on more than one occasion during the period in question and received at least one referral through the hall. Thompson Dec., ¶56.

137.    Colley's peers identified by Dr. Thompson included two Black men: Frank James and James Giscombe—and one member who was a peer only in 2008 (Jospeh Bilella), which falls outside the time period used by Dr. Thompson. Stanton Decl. ¶ 31; Ex. 53.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

138.    Blackwood's peers as determined by Dr. Thompson consisted of the following: Corcoran, Costa, Davila, Grasso, Keeley, Lanzetta, and Scalici. Only Robert Keeley ever visited the referral hall from 2013-2019 and he did so on only one occasion in 2014. Stanton Decl. ¶ 32.

Response: Disputed. Costa visited the referral hall on more than one occasion during the period in question and received at least one referral through the hall. Thompson Dec., ¶56.

139.    Hyatt's White peers as determined by Dr. Thompson consisted of the following engineers: Cirillo, Corcoran, Costa, Davila, Grasso, Guarino, Guidice, Keeley, Lanzetta, McPhail, Panarella, Peterson, Piazza, Ryan, Scalici, and Yuelling. Only Cirillo, Keeley, Peterson, and Ryan ever attended the referral hall from 2013-2019. Keeley attended the referral on a single day in 2014. Ryan attended twice in 2017 and once in 2013. Peterson attended once in 2019. Stanton Decl. ¶ 33.

Response: Disputed. Costa visited the referral hall on more than one occasion during the period in question and received at least one referral through the hall. Thompson Dec., ¶56.

140.    Langford's peers as determined by Dr. Thompson consisted of the following White engineers: Abbate, Agro, Badstein, Casillo, Chomlek, Corcoran, Costa, Davila, Galizia, Glazewski, Grasso, Guarino, Guidice, Heal, Justesen, Keeley, Lanzetta, Libretto, Melisi, Mulligan, Piazza, Planz, Romeo, Santoro, Scalici, Sfferraza, Szulborski, Tsoukalas, and Yuelling. Only Abbate, Agro, Badstein, Chomlek, Keeley, Mulligan, Planz, Santoro, and Tsoukalis ever attended the referral hall from 2013 to 2019. Abbate attended twice in 2019. Agro attended approximately 25 times in 2013, but only once in 2014, and never again thereafter during the relevant period. Badstein attended only 3 times in 2013, 16 times in 2014, and 7 times in 2015, after which he never attended the hall again during the relevant period. Chomlek attended just once in 2016. Keeley attended just once in 2014. Mulligan attended twice in 2019. Planz attended twice in 2015. Santoro attended three times in 2017. Tsoukalis attended 5 times in 2013, 8 in 2014, and 16 times in 2016, and zero times after June of 2016. Stanton Decl. ¶ 34.

54

Response: Disputed. Costa visited the referral hall on more than one occasion during the period in question and received at least one referral through the hall. Thompson Dec., ¶56.

141.     Langford's peers identified by Dr. Thompson included two Black engineers—Priscilla Ingram and John Williams—and one engineer, Sean Moroney, who was a peer of Langford in 2009, which falls outside of the time period used by Dr. Thompson. Ex. 53; McNamara Decl. ¶ 30.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

142.     The Daily Referral database relied upon by Dr. Thompson in his report does not contain data regarding the referral of Local 15C members. Stanton Decl. ¶ 7.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

155.     Local 15C primarily represents members working in shops where mechanics fix equipment, such as dealer's shops, general contractor's shops, and rental shops. Thomas 30b6 Tr. 12:20-23; Callahan Tr. 23:24-24:5.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

156.     Local 15C is a separate and distinct branch from Local 15-15A; members can be in either 15C or 15-15A but cannot be members of both branches at once. Thomas 30(b)(6) Tr. 13:11-13; see also Kennedy Tr. 10:11-12 ("I'm Local 15C").

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

157.     Local 15C enters into separate collective bargaining agreements from Local 15-15A. Many employers who are signatory with Local 15C are not signatory with 15-15A. Callahan Decl. ¶ 11.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

158.     15C members cannot use the 15-15A referral hall to find work. Kennedy Tr. 10:11-12; Thomas 30(b)(6) Tr. 11:6-12:8.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

159.     Local 15C does not have a referral hall, but instead maintains an out-of-work list for members who are seeking employment. Thomas 30(b)(6) Tr. 13:14-14:24.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

160.     When a 15C member is out of work, he or she must visit the Union's office to register for the out of work list with the 15C business agent. Callahan Decl. ¶ 18; Ex. 55, Local 15C Out-of-Work List Procedures and Rules, at 1-2 (Rules 3, 6); Thomas 30(b)(6) Tr. 18:18- 19:9.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

161.     The member only needs to visit the office once each time he or she is out of work. Kennedy Tr. 67:21-68:6. Once a member is on the out-of-work list, the member will remain on the list until he or she obtains a permanent job, even if the member has short-term jobs that last for a few weeks or a couple of months in the interim. Kennedy Tr. 69:18-21.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

162.     When job opportunities become available, the 15C business representative will send the employer the resumes of all of the members on the out-of-work list who have the certifications that the employer has requested. Thomas 30(b)(6) 19:10-20:19. Then the employer determines who, if anyone, from the list to interview or hire. Thomas 30(b)(6) Tr. 20:4-11 ("it's the employer's choice who he wants to hire. He doesn't have to hire anybody off that list; he can hire somebody from the street."); Kennedy Tr. 53:17-21.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

163.    The 15C out-of-work list is nonexclusive. Ex. 55, 15C Out-of-Work Rules (Rule 1).

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

164.    Employers are not required to hire candidates who are on the out-of-work list and therefore can hire applicants directly. Thomas 30(b)(6) Tr. 20:4-11; Ex. 55 (Rule 8); Kennedy Tr. 54:2-12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

165.    Employers also can request to hire particular 15C members by name from the Union, even if those members are not on the 15C out-of-work list. Kennedy Tr. 54:13-55:2.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

166.    It is possible for members to transfer from one of the Union's branches to another branch. Callahan Tr. 24:25-25:3.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

167.    Article VI, Section 21 of the Union's Bylaws provides that "All members recognize that there are separate and distinct branches of this Local Union…. All members who wish to transfer from one branch of this Local Union to another shall appear before the Executive Board to make such transfer request and the same standards regarding clearance requests articulated earlier in this paragraph shall apply to branch transfer requests." Callahan Decl. ¶ 19; Ex. 65.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

168.    Ultimately, transfer between branches requires approval of the Union's Executive Board, as well as payment of any difference in dues amounts between the branches. Callahan Tr. 78:12-79:8.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

169.    Members with transfer requests must appear at an Executive Board meeting, and decisions on the transfer requests are reflected in the Executive Board meeting minutes. Callahan Decl. ¶¶ 12-15.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

170.    From 2013 to 2019, approximately 25 members transferred from 15C to 15-15A. Callahan Decl. ¶ 14. This includes at least 3 African American members. Callahan Decl. ¶¶ 14-15; Exhibit 55, April 2015 Executive Board Meeting Minutes; Exhibit 56, October 2015 Executive Board Meeting Minutes; Exhibit 58, April 2018 Executive Board Meeting Minutes.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

171.    Kennedy wanted to become a member of Local 15-15A and asked Salerno "umpteen times" to transfer from 15C to 15-15A. Kennedy Tr. 49:15-50:7.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

172.    Kennedy never appeared before the Union's Executive Board to request transfer to 15-15A. Callahan Decl. ¶ 17.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

173.    On May 15, 2012, Kennedy went to the 15-15A referral hall and attempted to sign in to the 15-15A out-of-work list but was told that he was not permitted to sign in because he was a 15C member. Kennedy Tr. 49:5-14, 70:7-71:16; Stanton Decl. ¶ 25; Ex. 59, Kennedy Hall Attendance.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

174.    Kennedy is a welder and has not attempted to learn other job classifications; he did not want to work in other trades and is "satisfied with being a welder." Kennedy 27:6- 29:13.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

175.    Kennedy obtained his own employment with Local 15C employers, rather than through the 15C out-of-work list. Kennedy Tr. 54:2-12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

176.    Kennedy remained on 15C's out-of-work list from March 11, 2014 until at least October 22, 2019. UNION 006752-53; Stanton DECL; Kennedy Tr. 116:16-118:25.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

177.    Kennedy became a member of Local 15 in June 2002 after he applied directly and was hired for a job with Hallen Welding Service, Inc., a company signatory to a CBA with Local 15C, and accumulated a certain number of work hours. Kennedy Tr. 13:12-16:4.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

178.    Kennedy worked as a welder for Hallen Welding off and on for years. Kennedy Tr. 29:14-16; 37:19-38:10; 44:16-45:1. He primarily worked outside of the employer's shop. Kennedy Tr. 16:5-12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

179.    The owner of Hallen Welding is Frank Sandie. Kennedy 96:20-25. Sandie was the only person who assigned Kennedy to jobs at Hallen Welding. Kennedy Tr. 97:5-15.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

180.    At some point, Sandie stopped calling Kennedy for work. Kennedy Tr. 109:2-10. Kennedy acknowledges that the decision not to employ him again was Sandie's. Kennedy Tr. 109:11-17.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

181.    The last time that Kennedy called Local 15C business agent Michael Salerno to ask for work was around 2019. Kennedy Tr. 10:18-11:8.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

182.    On September 9, 2016, Kennedy filled out an EEOC intake questionnaire describing his claim of discrimination against the Union, which identified only age (not race) as the basis for his claim, and described the discrimination as, "I never get any work. Give work to younger men." Kennedy Tr. 60:5-61:3, 80:5-23; Ex. 62, Kennedy EEOC Intake Questionnaire at P BK000104-107; Ex. 63, Kennedy EEOC Intake Notes.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

183.    Kennedy has identified a younger Black worker named Adrien who he alleges always got work with 15C employers. Local 15C Union representative Salerno facilitated Adrian's hiring by Hallen Welding, along with another younger Black worker named Devon. Kennedy Tr. 74:4-74:25; 81:22-83:19.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

184.    Kennedy believes that white 15C members are given priority for jobs, but the only facts he has identified as supporting that belief are that he sees white members coming to Union meetings in work clothes. Kennedy Tr. 62:14-66:13.

Response: Disputed. When asked the basis for his claim that White members are given priority for jobs, Kennedy testified that "that's what we learn in the Union." Kennedy Dep. 62:16. He testified that workers who are currently working attend member meetings in work clothes. "You know when a man is working because he -- because he come to work, he come at the job with working clothes and all his tools and everything.' Kennedy Dep. 63:17-20.

185.    Kennedy cannot name any White employees that were given priority in the assignment of jobs. Kennedy Tr. 62:22-25.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

186.     Kennedy's allegations of more onerous work assignments are based on assignments that were made by his employer, with no involvement from his union (Local 15C) or its officials. Kennedy Tr. 94:7-97:15.

Response: Disputed. This is an inaccurate characterization of plaintiff's testimony.

**Defendants' Objection**: No dispute of material fact—Plaintiffs cite no record evidence.

187.     There are no jobs that Plaintiff Kennedy is aware of that he should have been assigned to but was not assigned to. Kennedy Tr. 112:7-12.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

188.     Kennedy does not know anything about the Union instructing contractors to request particular individuals by name. Kennedy Tr. 112:24-113:4.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

189.     Kennedy knows of no specific instances where he was discriminated against because of his race. Kennedy Tr. 122:24-123:5.

Response: Not disputed for purposes of this pre-motion Rule 56.1 statement.

190.     Kennedy's belief that he has been discriminated against is solely based on his assessment of the number of hours he has worked over the years. 123:6-10.

Response: Disputed. Plaintiff went on to testify that his belief is also based on the fact that White workers are working more hours. Kennedy Dep. 123:11-14.

### RESPONSE TO PLAINTIFFS' ADDITIONAL DISPUTED FACTS

Pursuant to Rule III.A.6(f) of Judge DeArcy Hall's Individual Practices, Defendants now respond as follows to the additional facts set forth in Plaintiffs' Rule 56.1 Statement:

191.    More than 50 years ago, in July, 1972, Local 15 was sued by the EEOC for violations of Title VII. EEOC v. International Union of Operating Engineers, 415 F. Supp. 1155, 1163 (S.D.N.Y 1976).

**Defendants' Response**: Not disputed that the EEOC filed the aforementioned lawsuit, but this is not material. The lawsuit was filed over 50 years ago, long outside the statute of limitations period, and it did not address any allegations material to the present case.

192.    Among the acts complained of by the EEOC were the following:

(a)     Failing and refusing to admit non-white and Spanish surnamed workers into the defendant unions as journeymen members on the same basis as whites are admitted;

(b)     Failing and refusing to refer non-white and Spanish surnamed workers for employment within their respective jurisdictions on the same basis as whites are referred by applying standards for referral which have the purpose and effect of insuring referral priority to their members, a substantial number of whom are white;

*EEOC v. International Union of Operating Engineers*, 415 F. Supp. 1155, 1159 (S.D.N.Y 1976).

**Defendants' Response**: Not disputed that Plaintiffs correctly quote the EEOC's allegations as set forth in the nearly 50-year-old decision, but these allegations are not material. These allegations not only are well outside the statute of limitations, but also refer to the Union's prior practices for accepting new members and giving members priority over nonmembers for referrals. Plaintiffs admit that they have been members of the Union at all relevant times, so allegations relating to nonmembers or to membership admission practices are irrelevant and untimely. *See supra* ¶¶ 4, 177.

193.    As of September 1, 1974, Local 15 had 6,362 members, of whom 6.5 percent were Black or Hispanics. EEOC v. International Union of Operating Engineers, 415 F. Supp. 1155, 1163 (S.D.N.Y 1976).

**Defendants' Response**: Not disputed that the Court made this factual finding, but the Union's membership demographics from nearly 50 years ago are not material to the Plaintiffs' present individual disparate treatment claims.

194.    According to the Union's records, out of 8,261 members admitted after August 1, 1972 (i.e., after the Union was sued by the EEOC), 380, or 4.6 percent are Black and 493, or 5.9 percent, are Hispanic. Thompson Dec., ¶12.

**Defendants' Response**: Disputed, but not material. Members' admission dates and membership demographics in relation to the EEOC's action are not relevant to the present case for the reasons discussed in response to ¶¶ 191-193, *supra*. Moreover, Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51, Letter Requesting Pre-Motion Conference on Motion to Strike.

In any event, Dr. Thompson's untimely declaration does not explain how he calculated this purported demographic information. Dr. Thompson appears to have included individuals who belong to other branches of the Union besides Local 15-15A and/or are deceased, retired, or not actively working in the trade; he therefore has grossly overstated the number of members to the extent he suggests that the alleged 8,261 members are presently active in Local 15-15A. As Dr. Lundquist found, of the 2,420 members who were active in the Union from 2013 to 2019, 8 percent were Black, and 9 percent were Hispanic. Lundquist Rep., Defs.' Ex. 16, ECF No. 49-16, at ¶ 24.

195.    A member who relies on the referral hall for work typically arrives at the hall at 6:00 a.m., and if referred to a job, works a full day. Langford Dec., ¶3.

**Defendants' Response**: Disputed that Plaintiff Langford "typically arrives at the hall at 6:00 a.m.." Plaintiff Langford's referral hall attendance records—which show the time that he

signed in to the referral hall's computer—demonstrate that he signed in after 6:00 a.m. on numerous occasions. Defs.' Ex. 69 (Langford Referral Hall Attendance), ECF No. 49-69; *see also* Defs.' Ex. 20, Stanton Decl., ECF No. 49-20, ¶¶ 12, 25. On approximately 89 occasions, Plaintiff Langford signed in at least 30 minutes after 6:00 a.m. Defs.' Ex. 69, ECF No. 49-69.

To the extent that Plaintiffs rely on Plaintiff Langford's testimony to establish the referral hall attendance and/or experiences on the job of other members, Defendants object that this alleged fact is not supported by admissible evidence because Plaintiff Langford lacks personal knowledge of others' practices or experiences. *See* Fed. R. Civ. P. 56(c)(2) & (c)(4); Fed. R. Evid. 602.

196.    If the referral is for a one day job, the member then repeats the process. Langford Dec., ¶4.

**Defendants' Response:** Disputed to the extent that Plaintiffs suggest that a member's only method of getting a job is through the referral hall. Plaintiffs acknowledge that employers may hire members directly, without going through the referral hall, or may request a particular member by name from the Union. *See supra* ¶¶ 7, 11-12.

In addition, for the same reasons set forth in response to ¶ 195, *supra*, Defendants object that Plaintiff Langford lacks personal knowledge to testify about the referral hall attendance practices of other members.

Defendants do not dispute that Plaintiff Langford returned to the referral hall periodically after having worked, as reflected in his attendance records at Defs.' Ex. 69, ECF No. 49-69.

197.    The longer a job lasts, the less frequently a member must present himself in the referral hall. Langford Dec., ¶7.

**Defendants' Response**: Disputed to the extent that Plaintiffs suggest that a member's only method of getting a job is through the referral hall. Plaintiffs acknowledge that employers may

hire members directly, without going through the referral hall, or may request a particular member by name from the Union. *See* SUPRA ¶¶ 7, 11-12.

In addition, for the same reasons set forth in response to Plaintiffs' Additional Facts ¶ 195, Defendants object that Plaintiff Langford lacks personal knowledge to testify about the referral hall attendance practices of other members.

Defendants do not dispute that Plaintiff Langford returned to the referral hall periodically after having worked, as reflected in his attendance records at Defs.' Ex. 69, ECF No. 49-69. Those records speak for themselves in demonstrating the frequency of Plaintiff Langford's referral hall attendance.

198.    Longer jobs are immensely more preferable than short jobs. Langford Dec., ¶8.

**Defendants' Response**: Defendants do not dispute Plaintiff Langford's testimony as to his own preferences. To the extent that Plaintiff Langford purports to testify about the preferences of other members, for the same reasons set forth in response to ¶ 195, *supra*, Defendants object that Plaintiff Langford lacks personal knowledge.

199.    Having steady employment improves ones finances, family life, social life, sleep, emotional well being and overall quality of life. Langford Dec., ¶9.

**Defendants' Response**: Defendants do not dispute Plaintiff Langford's testimony as to his own experiences. To the extent that Plaintiff Langford purports to testify about the experiences of other members, for the same reasons set forth in response to ¶ 195, *supra*, Defendants object that Plaintiff Langford lacks personal knowledge.

200.    The more frequently one appears in the referral hall, the more one's family life, social life, sleep, emotional well being and overall quality of life suffers. Langford Dec., ¶10.

**Defendants' Response**: Defendants do not dispute Plaintiff Langford's testimony as to his own experiences. However, evidence of purported damages is not material at this stage of summary-judgment proceedings. In addition, to the extent that Plaintiff Langford purports to testify about the experiences of other members, for the same reasons set forth in response to ¶ 195, *supra*, Defendants object that Plaintiff Langford lacks personal knowledge.

201.    During the relevant period, Blacks accounted for 20 percent of hall attendances, or more than 5 times their proportionate union membership. Thompson Dec., ¶13.

**Defendants' Response**: No dispute of material fact—Plaintiffs cite improper expert testimony that should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

Furthermore, as noted above in response to ¶ 194, *supra*, Dr. Thompson has calculated the percentage of the Union's members for the 2013-2019 time period who are Black incorrectly. It follows that his calculation that Black members' hall attendance is "more than 5 times their proportionate union membership" is incorrect.

In any event, this alleged additional fact is not material. Statistics about Black members as a group are not sufficient to show alleged discrimination against the individual Plaintiffs. And many factors affect hall attendance frequency, such as whether a member is hired directly by a contractor instead of using the hall, whether a member chooses to visit the hall on any given day, and how long a contractor chooses to employ a member after hiring that member. *See supra* ¶¶ 7-12.

202.    During the relevant time period, out of the 20 members with the most hall attendances, 11 were Black. Thompson Dec., ¶14.

**Defendants' Response**: Defendants do not dispute this fact for purposes of summary-judgment proceedings, but note that it is not material, as it is not relevant to the alleged discrimination against the individual Plaintiffs. In addition, many factors affect hall attendance frequency, such as whether a member is hired directly by a contractor instead of using the hall, whether a member chooses to visit the hall on any given day, what skills a member possesses, and how long a contractor chooses to employ a member after hiring that member. *See supra* ¶¶ 7-12.

203.    Plaintiff Langford had the 6th most hall attendances during this period (496 appearances). Thompson Dec., ¶15.

**Defendants' Response**: Defendants do not dispute this fact.

204.    Plaintiff Blackwood had the 11th most hall attendances during this period (439 appearances). Thompson Dec., ¶16.

**Defendants' Response**: Defendants do not dispute this fact.

205.    Plaintiff Colley had the 12th most hall attendances during this period (434 appearances). Thompson Dec., ¶17.

**Defendants' Response**: Defendants do not dispute this fact.

206.    Plaintiff Hyatt had the 19th most hall attendances during this period (366 appearances). Thompson Dec., ¶18.

**Defendants' Response**: Defendants do not dispute this fact.

207.    Union members receive benefit stamps corresponding to the number of hours worked. Langford Dec., ¶18.

**Defendants' Response**: Defendants do not dispute this fact.

208.    Benefit stamps are "redeemed" at the Union's Fund office several times a year. Langford Dec., ¶19.

**Defendants' Response**: To the extent that Plaintiff Langford purports to testify about the stamp-redemption practices of other members, Defendants object on the ground that Plaintiff Langford lacks personal knowledge. *See* Fed. R. Civ. P. 56(c)(2) & (c)(4); Fed. R. Evid. 602. Defendants note that the Local 15 Benefit Funds rely on members to submit stamps, and that the hours-worked data contained in the databases at issue in this litigation comes from the individual members' submission of stamps. *See* Stanton Decl. ¶ 15. Individual members' practices with regard to submission of stamps may vary; however, the frequency of stamp redemption is not material for purposes of summary judgment.

209.    The number of hours worked for a given employer during any given period is a good indicator of how long the job with that employer lasted. Thompson Dec., ¶20.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). Even if Dr. Thompson's belated declaration could be considered, Defendants object that Dr. Thompson lacks personal knowledge of the Union's operating procedures and of general practices in the New York City construction industry, so his testimony on this point is inadmissible. *See* Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4); *see also* Ex. 39, Thompson Tr., ECF No. 49-39 (testifying that "Counsel's representation of the Union was probably the summary that I relied upon" in learning how the referral system operates).

Moreover, this alleged additional fact is disputed to the extent that Plaintiffs suggest that a member could work only a single "job" with any given employer within a stamp-redemption

period. Plaintiffs do not dispute that employers can move members from machine to machine, or from job to job. *See supra* ¶¶ 9, 66. A member therefore could have multiple jobs with the same employer.

210.    During the relevant time period, the average number of regular hours redeemed per employer per period by a White member was 288. Thompson Dec., ¶21.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

In any event, this alleged fact is not material, because there is no causal link between the Union's referral hall practices and job length or number of hours redeemed. It is undisputed that employers, not the Union, control the duration of members' employment. *See supra* ¶ 65. It is also undisputed that members can obtain employment directly from contractors without using the referral hall. *See supra* ¶¶ 7, 9-12.

211.    The same number for each plaintiff is as follows:

| Langford | 72 |
|---|---|
| Hyatt | 75 |
| Kennedy | 192 |
| Colley | 32 |
| Nalty | 60 |
| Blackwood | 51 |

Thompson Dec., ¶22.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this alleged fact is not material for the reasons set forth *supra* at ¶ 210.

212.    Most overtime is paid as double time. Langford Dec., ¶21.

**Defendants' Response**: For purposes of summary-judgment proceedings, Defendants do not dispute the allegations in Plaintiffs Additional Fact ¶ 212.

213.    During the relevant time period, the average number of overtime hours redeemed per employer per period by a White member was 50. Thompson Dec., ¶23.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this alleged fact is not material for the reasons set forth *supra* at ¶ 210.

214.    The same number for each plaintiff is as follows:

| Langford | 22 |
|----------|------|
| Hyatt | 8.5 |
| Kennedy | 7.2 |
| Colley | 9.7 |
| Nalty | 16.3 |
| Blackwood | 4.8 |

Thompson Dec., ¶23.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this alleged fact is not material for the reasons set forth *supra* at ¶ 210.

215.    There are very few opportunities for finding one's own employment within the Union's jurisdiction without the Union's involvement and assistance. Construction companies do not solicit trade employees online, in newspapers or anywhere else, and they do not have hiring offices for trade labor. Langford Dec., ¶22.

**Defendants' Response**: Disputed. Plaintiff Langford's declaration should be disregarded because it contradicts his deposition testimony and creates new factual issues for the first time. *See Bacchus v. N.Y.C. Dep't. of Educ.*, 137 F. Supp. 3d 214, 225-26 (E.D.N.Y. 2015) ("'[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.' *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). '[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.' *Id.*").

Plaintiff Langford found his own work a least a few different times with William A. Gross Construction by calling the employer directly to ask for work. Langford Tr. 38:15-40:18. When asked if there was any other way he tried to find his own work besides the referral hall or calling William A. Gross, Plaintiff Langford stated that he had visited job sites to see if there were

openings, but that he did not recall when, which job site, which contractor, who he talked to, or even if he had visited a job site to look for work since 2013. Langford Tr. 53:10-55:10. Plaintiff Langford also testified that he did not contact any employers that he had previously worked for other than William A. Gross; he did not call friends to see if they knew of contractors who had available work; and he did not attend union meetings (even though he was aware that business agents discussed upcoming jobs at those meetings). *Id.* at 55:11-56:12. Besides visiting unidentified job sites at an unknown time, Plaintiff Langford never identified any other attempts to search for employment—let alone any online searches, reading newspapers, or attempts to find an employer's hiring office. Nothing in Plaintiff Langford's deposition testimony, or in the new information provided for the first time in his self-serving declaration, suggests that the assertions in Paragraph 22 of his declaration are based on personal knowledge regarding job search opportunities. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). His declaration therefore cannot be used to oppose a motion for summary judgment.

Plaintiff Langford also testified at his deposition that people can find their own work, without mentioning any limitations on how construction companies solicit job applicants. Langford Tr. 195:11-13. Indeed, all of the Plaintiffs who are Local 15-15A members testified that employers can recruit and hire workers directly, and that members can actively solicit their own work, without mentioning any such limitations on the opportunities to do so. *See supra* ¶ 7 (citing Blackwood Tr. 10:2-13:6, 13:8-12, 120:7-20; Colley Tr. 43:7011, 126:18-21; Hyatt Tr. 41:15-42:8; Nalty Tr. 41:19-22); ¶ 11 (citing Blackwood Tr. 89:5-7, Nalty Tr. 41:19-42:3; Langford Tr.

177:16-18; Hyatt Tr. 41:6-10); ¶ 12 (citing Blackwood Tr. 10:2-13:8, Hyatt Tr. 41:15-43:10, Langford Tr. 39:3-40:18).

Finally, Plaintiffs ignore their testimony that contractors can choose to move employees from machine to machine or from job to job; members whose jobs are ending therefore can obtain employment at new job sites if the contractor chooses to retain them. *See supra* ¶¶ 8-9 (citing Blackwood Tr. 20:13-24:11, Colley Tr. 129:11-24; Langford Tr. 195:14-22, 210:8-211:11). Although Plaintiffs purport to dispute that contractors can move employees without the Union's involvement, there is no admissible evidence that supports their position. Plaintiffs' only evidence for the assertion that "[t]he Union requires contractors and members to obtain the Union's consent to the moving of members from machine to machine or job to job" is Rules 19-20 of the Union's referral rules—which contain no such blanket consent requirement.[5] *See supra* ¶ 8 (citing Exhibit 13, Referral Rules, ECF No. 49-13, at UNION 8690-91 (Rules 19 and 20).).

216.    The most common scenario for finding a job on one's own is to pass by construction sites and try to find a piece of equipment within Local 15's jurisdiction that is not being manned by a member of the Union. Much of the equipment within Local 15's jurisdiction requires no skill or experience, such as manning a light tower, and it is not uncommon for a contractor to try to reduce expenses by having a common laborer operate that equipment. Langford Dec., ¶24.

**Defendants' Response**: Defendants do not dispute that visiting job sites is a method of finding one's own employment and that contractors sometimes attempt to staff jobs with labor at

---

[5] Rule 19 provides only that "no person *dispatched via the Referral List* will operate any machinery or equipment other than that which he was originally assigned to on referral, without the prior approval of Local 15." *Id.* at UNION 8690 (emphasis added). There is no such requirement for members who were hired by means other than the referral hall. Rule 20 contains job-reporting requirements for "[w]hen the machine or equipment *to which a member was referred* is moved to a different job or shut down." *Id.* at UNION 8691. This rule also applies only to referrals through the referral hall, and not to employment obtained by other means. *Id.* Moreover, even for referrals from the referral hall, Rule 20 provides that "[t]he Employer shall retain its right to transfer the member who is on its payroll from one project to another project within the jurisdiction of Local 15," so long as the transfer is "done on a daily basis and not on an hourly basis." *Id.*

nonunion wages. *Cf.* Langford Tr. 45:20-46:20 (acknowledging that making sure laborers are not working Local 15 jobs is one reason a Union business agent may visit a job site). However, there is no evidence in the record to suggest that visiting job sites is "the most common scenario for finding a job on one's own." Plaintiff Langford even testified that while he tried to find his employment by visiting job sites, he was never successful at obtaining employment that way, although he did obtain employment by calling William A. Gross directly. Langford Tr. 39:3-41:16, 53:10-55:10. Visiting job sites therefore cannot be the most common method for Plaintiff Langford to find a job. Plaintiff Langford cannot use his declaration to create an issue of fact by contradicting his deposition testimony. *See Bacchus*, 137 F. Supp. 3d at 225-26. Furthermore, nothing in Plaintiff Langford's declaration suggests that he has personal knowledge of how other members obtain their employment; his testimony on other members' job-search methods therefore is inadmissible and cannot be used to oppose summary judgment. *See* Fed. R. Civ. P. 56(2) & (4), Fed. R. Evid. 602.

217.    The type of jobs that can be found on one's own are typically short term and low paying. Langford Dec., ¶25.

**Defendants' Response**: This purported fact is not supported by admissible evidence. To the extent that Plaintiff Langford makes assertions about any job-search experiences other than his own, he lacks personal knowledge of the experiences of other members; his testimony is therefore inadmissible and cannot be used to oppose summary judgment for the same reasons set forth *supra* at ¶ 216. Moreover, there is no genuine dispute that contractors often retain members in their employment for long periods of time and move those members from job to job or machine to machine; members can retain such employment without having to return to the referral hall for each new job. *See supra* ¶¶ 8-11, 215.

218.    If a contractor wishes to hire a member directly or by name, the Union requires the contractor to send a written request to the Union. Exhibit D13, page Union 8688.

**Defendants' Response**: This alleged additional fact mischaracterizes the Union's Referral Rules and the other evidence in the record. Although the Referral Rules require that employers who request a member by name *from the Union* must send such requests in writing, nothing in those rules require employers to send requests to the Union to hire a member directly without the Union's involvement. Defs.' Ex. 13, Referral Rules, ECF No. 49-13 at UNION 8688. There is no genuine dispute that employers can hire members directly without the Union's involvement or can request particular members by name from the Union; those are two separate methods of hiring. *See supra* ¶¶ 7, 215 (no genuine dispute as to *supra* ¶¶ 8-12, which show that employers can hire members directly); *supra* ¶ 30 (no dispute that contractors can ask the Union to hire a particular member by name).

219.    If a member finds his own job, or is moved by a contractor from one job to another, the Union's rules require the member to notify the Union and is subject to a fine if he fails to do so. Exhibit D13, page Union 8691.

**Defendants' Response**: It is undisputed Referral Rules have certain job-reporting and transfer-reporting requirements, and that violations of those requirements may subject members to a fine. Ex. 13, ECF No. 49-13, at 8687, 8691. Those are simply notification requirements, however; nothing in those rules restricts members' abilities to find their own job or to transfer jobsites at the beginning of the workday. The Referral Rules provide members with a "right to solicit own employment" (Rule 3) and provide employers with a "right to transfer the member who is on its payroll from one project to another project within the jurisdiction of Local 15," so long as the

transfer is "done on a daily basis" and not "after the contractually agreed upon start of the work day" (Rule 20). *Id.*

220.     Other than requests for members by name, the Union does not keep track of communications from contractors who want a member referred for a job. Thomas Dep., 52:8- 13; Burns Dep., 22:1-3; Cullimore Dep., 26:10-12.

**Defendants' Response**: This alleged additional fact mischaracterizes the evidence in the record, to the extent that Plaintiffs ignore the undisputed fact that the Union keeps a database of information regarding referrals made through the referral hall pursuant to requests from contractors. *See supra* ¶¶ 34-35. The information kept in this database is described at *supra* ¶¶ 34-35 (citing Exhibit 20, Stanton Decl., ECF No. 49-20, at ¶¶ 9-22). Defendants do not dispute that, aside from the database, the Union does not separately log calls or other communications regarding referral requests.

221.     The Union does not follow its own rules for the referral of members for jobs in at least the following respects:

--     The Union assigns members to job "out of order," meaning that they have not assigned the job to the member in the hall with the lowest reference number. Thompson Dec., ¶25.

--     The Union assigns jobs to members who do not sign into the referral hall, without attempting to fill the job from out of work members at the referral hall and without keeping any record of the referral. O'Neill Dec., ¶¶5-12.

--     The Union holds jobs for members without attempting to fill the job from out of work members at the referral hall and without keeping any record of the referral. O'Neill Dec., ¶11.

**Defendants' Response**: Disputed. To the extent that Plaintiffs rely on Dr. Thompson's conclusion that "[t]he Union assigns members to job[s] 'out of order,'" Dr. Thompson's analysis of alleged pass-overs is inaccurate for the reasons set forth more fully at *supra* ¶ 109; namely, that Dr. Thompson does not account for numerous variables that affect whether a member was eligible and available for any given referral. Defendants acknowledge that on occasion, the referral records show that members were not referred in the correct order due to such variables. But Defendants dispute any suggestion that the Union intentionally does not follow its referral rules; Plaintiffs have cited no admissible record evidence that could support such a suggestion.

The Union disputes that it "assigns jobs to members who do not sign into the referral hall, without attempting to fill the job from out of work members at the referral hall and without keeping any record of the referral." For this assertion, Plaintiffs cite to ECF No. 50-3, O'Neill Declaration ¶¶ 5-12, which in turn cites to a handful of text messages sent to or from business agent Andrew Cullimore. None of those text messages reflect a referral to a member by any means other than the referral hall—let alone a referral that Plaintiffs were denied.

Bernard Mulligan: The facts Plaintiffs allege regarding Mulligan are not material because none of the Plaintiffs were eligible to receive any opportunities offered to Mulligan on the date in question. Plaintiffs have identified Mulligan as a peer of Plaintiff Langford only. *See* O'Neill Decl. ¶ 5. When Cullimore sent text messages to Bernard Mulligan on September 8, 2016, October 28, 2016, and November 11, 2016 (cited to in O'Neill Decl. ¶¶ 5-7, ECF No. 50-3), Mulligan was a nonmember of the Union who was working on permit within the Union's jurisdiction, and therefore was not eligible for referrals through the referral hall. Exhibit 76, Cullimore Decl. ¶¶ 4, 6, 8.[6] Mulligan had previously been working for nonunion employers in the area and could run

---

[6] Defendants submit Cullimore's declaration only for the purposes of replying to the facts newly alleged by Plaintiffs in Mr. O'Neill's declaration. Defendants had no way of anticipating that Plaintiffs would raise these issues when

multiple machines within the Union's jurisdiction, so Cullimore determined that placing Mulligan on permit so that he could begin the process of becoming a member would be beneficial to the Union's interests. *Id.* ¶ 4. Nonmembers are not permitted to sign in to the computer at the referral hall, and work given to nonmembers who are working on permit is not logged as a referral in the Union's records. *Id.* ¶ 8. Many nonmembers working on permit find their own jobs, but sometimes the business agents will send them to particular opportunities when a job cannot be filled through the referral hall. *Id.* ¶ 9.

Plaintiff Langford would not have been eligible to receive any opportunities given to Mulligan in September or October 2016 because Langford was not in the referral hall at that time. He did not sign in to the hall from August 5, 2016 until November 21, 2016. Exhibit 69, Langford Hall Attendance History, ECF No. 49-69, at 12.

Mulligan became a member of the Union in December 2016. Cullimore Decl. ¶ 6. He worked steadily for Unicorn Construction Enterprises, Inc. for several years. *Id.* ¶ 7. The two times that he attended the referral hall (referred to in O'Neill Decl. ¶ 6) were in December 2019—after he became a member. Ex. 20, Stanton Decl, ECF No. 49-20 ¶ 34.

Joe Guidice: On April 17, 2017, Joe Guidice was a nonmember working on permit within the Union's jurisdiction. Cullimore Decl. ¶ 11. After the referral hall was closed for the day, Cullimore sent Guidice to a one-night job running an asphalt backhoe ripper. *Id*. Guidice became a Union member in January 2018. *Id*. Plaintiffs allege that Guidice is a peer of Plaintiffs Hyatt and Langford. *See* O'Neill Decl. ¶ 6. It is undisputed that Plaintiff Hyatt does not have a backhoe

---

submitting their Rule 56.1 Statement, particularly in light of Plaintiffs' interrogatory responses stating that they did not have information regarding any White members who received jobs they should have received. *See* Exs. 45 - 50, ECF Nos. 49-45 – 49-50. We also note that Plaintiffs deposed Cullimore but did not ask him about any of his text messages.

certification (which is required to run a backhoe ripper) and therefore would not have been eligible for the job. *See supra* ¶¶ 22, 36; Cullimore Decl. ¶ 12.

Brian Garland: The facts Plaintiffs allege regarding Garland are not material because none of the Plaintiffs were eligible to receive any opportunities offered to Garland on the date in question. Plaintiffs correctly note that contractor Bobby Hamill made an after-hours request on May 19, 2017 at 3:27p.m., after the hall had closed for the day. ECF No. 50-3, Pls.' Ex. 1, at UNION 10353. On that Friday afternoon, Hamill wrote that he "just ran into a pickle" and asked for a "doze[r] man that can carry a finish grade" on Monday at 7a.m. *Id*. Cullimore understood this to be a request for a fine grade dozer operator; given the timing, he needed to fill the request before the hall opened on Monday. Cullimore Decl. ¶ 13. Plaintiff Langford is the only Plaintiff who has a certification to operate a fine grade dozer on file with the Union. *See supra* ¶¶ 36-41; Defs. Exs. 24-28, ECF Nos. 49-24 – 49-28. Plaintiff Langford was not in the referral hall on May 19, 2017; he signed in on May 9, 2017 and did not sign in again until July 7, 2017. Ex. 69, ECF No. 49-69, at 15.

Brian Cea: The facts Plaintiffs allege regarding Cea are not material because none of the Plaintiffs were eligible to receive any opportunities offered to Cea on the date in question. As Plaintiffs acknowledge, Cea reached out to Cullimore in January 2020 about a potential vac truck opportunity. ECF No. 50-3, Pls.' Ex. 1, at UNION 10366. Cullimore is the business agent primarily responsible for referring members to jobs on vac trucks, which are difficult positions to fill because few members have the requisite certifications. Cullimore Decl. ¶ 14. Specifically, members need a commercial driver's license (CDL) and a tank endorsement to run a vac truck; depending on the job, they may also need a HAZMAT certification. *Id*. These certifications are sufficiently rare that Cullimore often must reach out to qualified members directly to fill vac truck opportunities; Cea

is one of the members who can run a vac truck. *Id.* ¶¶ 14-15. None of the Plaintiffs have a CDL, so none of them are eligible for vac truck positions. *See supra* ¶¶ 36-41; Defs. Exs. 24-28, ECF Nos. 49-24 – 49-28.

Doug Meyer: The facts Plaintiffs allege regarding Meyer are not material because none of the Plaintiffs were in the referral hall on April 26, 2019, the day that Cullimore texted Meyer, or on April 29, 2019, the day that they allege Meyer received a referral. Defs. Exs. 66-70, ECF Nos. 49-66 at 16; 49-67 at 19; 49-68 at 13; 49-69 at 19; 49-70 at 7. Furthermore, Meyer was referred to work on a dozer job. Ex. 78, 2nd Stanton Decl. ¶ 4. None of the Plaintiffs except for Plaintiff Langford had a dozer certification, so only Plaintiff Langford would have been eligible for the job if he had attended the referral hall (and he did not do so between April 12, 2019 and June 3, 2019). Exs. 24-28, Plaintiffs' Certifications, ECF Nos. 49-24 – 49-28; Ex. 69, Langford Hall Attendance, ECF No. 49-69 at 19.

Ron McTurk: Only Plaintiff Langford was in the referral hall on June 20, 2014, the day that Cullimore texted McTurk. Exs. 66-70, ECF Nos. 49-66 at 3; 49-67 at 4; 49-68 at 2; 49-69 at 7; 49-70 at 2.

222.   The Union's out of order referrals favor Whites over Blacks to a statistically significant degree. Thompson Report, Exhibit D40, ¶¶46-50.

**Defendants' Response**: Disputed, but not material. Dr. Thompson's analysis of alleged pass-overs is inaccurate for the reasons shown *supra* at ¶ 109. But even if Dr. Thompson's analysis were correct, any findings regarding statistical significance as to the Union's Black membership as a whole are not material. This is an individual disparate treatment case, not a class action or disparate impact case, and Dr. Thompson acknowledges that the individual Plaintiffs were not passed-over to a statistically significant degree. Ex. 40, Thompson Rep., Table 3. Dr. Lundquist

analyzed the number of out-of-order referrals for Plaintiffs individually using Dr. Thompson's numbers of referrals and found that three of the five Plaintiffs were passed over significantly *fewer* times than expected. *See supra* ¶ 108. After accounting for sign-in times at the referral hall for the remaining Plaintiffs, Dr. Lundquist found that "Plaintiff Hyatt's pass over rate becomes non-significant and Plaintiff Colley's statistical significance drops substantially." *See supra* ¶¶ 111-113 (citing Lundquist Rep. ¶¶ 62-64 & Tables 7c & 7d).

223.    Plaintiffs retained Dr. Shane Thompson to analyze the Union's records in order to determine whether race (and in the case of Colley, gender) was a factor in the Union's assignment of jobs to plaintiff. Thompson Report, Exhibit D40, ¶7.

**Defendants' Response**: Defendants do not dispute Dr. Thompson's understanding of why Plaintiffs retained him, but disputed to the extent that Plaintiffs suggest that Dr. Thompson actually analyzed both race and gender throughout his report. Dr. Thompson did not analyze gender in his pass-over analysis, and that with respect to Plaintiff Colley's "peer" analysis for visits per 1,000 hours, Dr. Thompson only analyzed gender, not race. Thompson Rep. ¶¶ 46-50, Table 5; Ex. 39, ECF No. 49-39, Thompson Tr. 119:7-121:16.

224.    Dr. Thompson determined that the number of referrals per 1,000 hours of work was the most appropriate metric for analyzing the Union's records. Thompson Dec., ¶26.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

225.    Dr. Thompson rejected the number of referrals as a meaningful metric, because it was not race neutral and because it ignored the fact that fewer referrals corresponded with longer jobs, which was a desirable outcome. Thompson Dec., ¶26.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, whether fewer referrals "corresponded with longer jobs" is not causation; referral numbers would be low or nonexistent for members who obtain their own employment working steadily for one contractor. *See supra* ¶ 11.

226.    Dr. Thompson controlled for relevant certification by comparing plaintiffs to other members who had no certification that the plaintiff in question did not have. This ensured that every job that a comparator had was a job that the plaintiff in question could have performed. Dr. Thompson identified the comparators as "peers." Thompson Dec., ¶28.

**Defendants' Response**: Defendants dispute the statement that Dr. Thompson's peer analysis "ensured that every job that a comparator had was a job that the plaintiff in question could have performed." Dr. Thompson did not account for whether the alleged peers' hours were attributable to jobs obtained directly from an employer, outside of the referral hall. *See supra* ¶¶ 120-23;[7] *see also* Thompson Tr. 60:1-61:19 ("if someone had work hours…perhaps they had 500 work hours in a given year, but they had zero visits to the work—to the Union hall. Those people would be included in the data set"). It is undisputed that members do not have to have certifications

---

[7] Although Plaintiffs purport to dispute certain facts alleged in these paragraphs, Dr. Thompson's testimony is clear for the reasons described *supra* at ¶¶ 120-23.

on file with the Union for jobs obtained directly from contractors, and that contractors are not required to make sure that members have certifications unless the certifications are required by law. *See supra* ¶¶ 25-26. In other words, Dr. Thompson did not take into account that members who obtained their jobs directly may have had skills or qualifications for which the Plaintiffs do not have certifications.

227.    Dr. Thompson determined that non-white members and female members had to visit the referral hall far more often than White and Male engineers to get the same amount of work, with a statistical significance at the 1 percent level. Thompson Dec., ¶29.

**Defendants' Response**: Defendants do not dispute that Dr. Thompson made this finding, but Dr. Thompson's conclusions are inaccurate for the reasons set forth at *supra* ¶¶ 114-141.

228.    When compared to their peers, plaintiffs were extreme outliers, making far more visits to the referral hall and getting far fewer work hours. Thompson Dec., ¶30. In response to criticism leveled by Dr. Lundquist, Dr. Thompson expanded the notion of peer by grouping certifications into categories. This increased the sample size of each plaintiff's peers. Dr. Thompson did this to determine whether there was any validity to Dr. Lundquist's criticisms. Thompson Dec., ¶31.

**Defendants' Response**: To the extent that Plaintiffs rely on Paragraphs 31-33 and Exhibit A of Dr. Thompson's declaration, Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information and untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. At this stage of summary-judgment proceedings, Defendants cannot meaningfully respond to this testimony, which was provided well after the close of discovery.

229.      In response to criticism leveled by Dr. Lundquist, Dr. Thompson expanded the notion of peer by grouping certifications into categories. This increased the sample size of each plaintiff's peers. Dr. Thompson did this to determine whether there was any validity to Dr. Lundquist's criticisms. Thompson Dec., ¶31.

**Defendants' Response**: To the extent that Plaintiffs rely on Paragraphs 31-33 and Exhibit A of Dr. Thompson's declaration, Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information and untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. At this stage of summary-judgment proceedings, Defendants cannot meaningfully respond to this testimony, which was provided well after the close of discovery.

230.     The results of Dr. Thompson's expanded peer analysis were similar to his initial peer analysis, which served to confirm results of his initial analysis. Thompson Dec., ¶33.

**Defendants' Response**: To the extent that Plaintiffs rely on Paragraphs 31-33 and Exhibit A of Dr. Thompson's declaration, Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information and untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. At this stage of summary-judgment proceedings, Defendants cannot meaningfully respond to this testimony, which was provided well after the close of discovery.

231.     In her report, Dr. Lundquist claims to have repeated Dr. Thompson's out of order referral analysis but taking into account the time that the referral was made. Dr. Lundquist does not explain how this was done, she does not identify what data she used, and she does not share the results of the analysis apart from her conclusory summary. The analysis that Dr. Lundquist

claims to have performed could not be done accurately, because the the Union's records do not reflect the time of referral. Thompson Dec., ¶34.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Moreover, Defendants produced documents showing how Dr. Lundquist calculated sign-in times in analyzing out-of-order referrals. 2nd Simon Decl. ¶¶ 4-5; Ex. 74 at 10-11.

232.   Dr. Lundquist claims to have analyzed the number of referrals obtained by each plaintiff and concluded that the number of referrals they received was proportionate to the number of visits that they made to the referral hall. Albeit faulty for any number of reasons, this analysis is essentially irrelevant, because the essence of plaintiffs' complaint is that they have to go to the referral hall too many times and receive too few hours of work. Thompson Dec., ¶35.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

233.   Dr. Lundquist performed some calculations and made some observations based on the "top ten" types of jobs requested via the referral hall, discussed above by defendants at paragraphs 46-48. This analysis is deceptive for several reasons. First, it says nothing about other engineers, e.g., how many jobs does the average White engineer have certifications for? If the average White engineer is qualified for 25 percent of the jobs, Langford would be expected to receive more referrals since he is qualified for 55 percent of the jobs. Thompson Dec., ¶36.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this alleged fact is not material because it ignores the undisputed fact that certifications are only required to be on file for members *who use the referral hall*. *See supra* ¶¶ 22-26. The number of certifications an average White engineer possesses does not account for whether that engineer uses the hall and thus has no bearing on this analysis, which is specific to referrals from the referral hall.

234.    Dr. Lundquist's "top ten" analysis is also fallacious, because it fails to take into account the number of engineers who have qualifications for any particular job classification. For example, only 144 members have the state welding certification. There were 765 referrals during the relevant time period, which, if evenly distributed amongst qualified members (without consideration of hall attendances), it would result in 5.31 jobs per member. Thompson Dec., ¶37.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). Moreover, this alleged fact is not material because, as discussed *supra* at ¶ 233, it is undisputed only members who use the referral hall are required to have certifications on file. There is no reason to assume that

referrals should have been "evenly distributed amongst qualified members" when it is undisputed that members can be hired through methods other than referrals. *See supra* ¶¶ 7-12.

235.    1611 members are qualified for pump jobs. There were 2696 referrals for pump jobs, which, if evenly distributed amongst qualified members (without consideration of hall attendances), it would result in 1.67 jobs per member. Thompson Dec., ¶38.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). Moreover, this alleged fact is not material for the same reasons discussed *supra* at ¶ 234.

236.    Another reason the "top ten" analysis is meaningless is because it fails to take into account the qualifications of members who attended the hall and how many times they attended the hall. For example, only 97 members received referrals for jobs requiring state welding licenses, suggesting that about a third of the members with that qualification never or rarely attended the referral hall. Thompson Dec., ¶40.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains untimely expert rebuttal testimony in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, Plaintiffs' assertion is incorrect—Dr. Lundquist analyzed the frequency of referrals for the top ten certifications, the total number of engineer visits for engineers having each certification, and the

87

corresponding percentages of referrals and visits for each Plaintiff. Ex. 16, Lundquist Rep., ECF No. 49-16, at ¶50 & Tables 5a – 5j.

237.    During the 2013 through 2019 time period, a job was assigned to a White member that plaintiff Langford was qualified for on 333 occasions, even though Langford was in the referral hall and had a lower reference number than the White member. Thompson Dec., ¶41.

**Defendants' Response**: Disputed. Dr. Thompson's initial analysis of out-of-order referrals (which analyzed Plaintiffs only as a group, not individually) failed to account for numerous relevant variables that affect whether a member receives a referral. *See supra* ¶ 33 (undisputed that multiple factors affect whether members receive referrals, such as whether member was requested by name, time of day of referral and member's sign in to hall, refusal of referral, certification(s) requested, whether referral occurred after hours, and when work was set to begin); ¶ 109 (undisputed that Dr. Thompson did not consider request by field or comment field, which contain information on factors affecting referrals). Dr. Thompson therefore deemed many referrals to be out-of-order referrals when those referrals were in fact not true pass-overs.

In addition, this additional fact contradicts Plaintiff Langford's verified interrogatories. All Plaintiffs submitted identical interrogatory responses stating that they could not "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," because "for the most part, the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants have made sure it does not exist." *See supra* ¶ 94 (citing Ex. 48, Langford June 2023 Interrogatory Responses, ECF No. 49-48 (No. 21)).

238.    During the 2013 through 2019 time period, a job was assigned to a White member that plaintiff Blackwood was qualified for on 86 occasions, even though Blackwood was in the referral hall and had a lower reference number than the White member. Thompson Dec., ¶42.

**Defendants' Response:** Disputed. Dr. Thompson's initial analysis of out-of-order referrals (which analyzed Plaintiffs only as a group, not individually) failed to account for numerous relevant variables that affect whether a member receives a referral. *See supra* ¶ 33 (undisputed that multiple factors affect whether members receive referrals, such as whether member was requested by name, time of day of referral and member's sign in to hall, refusal of referral, certification(s) requested, whether referral occurred after hours, and when work was set to begin); ¶ 109 (undisputed that Dr. Thompson did not consider request by field or comment field, which contain information on factors affecting referrals). Dr. Thompson therefore deemed many referrals to be out-of-order referrals when those referrals were in fact not true pass-overs.

In addition, this additional fact contradicts Plaintiff Blackwood's verified interrogatories. All Plaintiffs submitted identical interrogatory responses stating that they could not "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," because "for the most part, the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants have made sure it does not exist." *See supra* ¶ 94 (citing Ex. 45, Blackwood June 2023 Interrogatory Responses, ECF No. 49-45 (No. 21)).

239.     During the 2013 through 2019 time period, a job was assigned to a White member that plaintiff Colley was qualified for on 143 occasions, even though Colley was in the referral hall and had a lower reference number than the White member. Thompson Dec., ¶43.

**Defendants' Response:** Disputed. Dr. Thompson's initial analysis of out-of-order referrals (which analyzed Plaintiffs only as a group, not individually) failed to account for numerous relevant variables that affect whether a member receives a referral. *See supra* ¶ 33 (undisputed that multiple factors affect whether members receive referrals, such as whether member was requested by name, time of day of referral and member's sign in to hall, refusal of referral, certification(s) requested, whether referral occurred after hours, and when work was set to begin); ¶ 109 (undisputed that Dr. Thompson did not consider request by field or comment field, which contain information on factors affecting referrals). Dr. Thompson therefore deemed many referrals to be out-of-order referrals when those referrals were in fact not true pass-overs.

In addition, this additional fact contradicts Plaintiff Colley's verified interrogatories. All Plaintiffs submitted identical interrogatory responses stating that they could not "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," because "for the most part, the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants have made sure it does not exist." *See supra* ¶ 94 (citing Ex. 46, Colley June 2023 Interrogatory Responses, ECF No. 49-46 (No. 21)).

240.     During the 2013 through 2019 time period, a job was assigned to a White member that plaintiff Hyatt was qualified for on 93 occasions, even though Hyatt was in the referral hall and had a lower reference number than the White member. Thompson Dec., ¶44.

**Defendants' Response:** Disputed. Dr. Thompson's initial analysis of out-of-order referrals (which analyzed Plaintiffs only as a group, not individually) failed to account for numerous relevant variables that affect whether a member receives a referral. *See supra* ¶ 33 (undisputed that multiple factors affect whether members receive referrals, such as whether member was requested by name, time of day of referral and member's sign in to hall, refusal of referral, certification(s) requested, whether referral occurred after hours, and when work was set to begin); ¶ 109 (undisputed that Dr. Thompson did not consider request by field or comment field, which contain information on factors affecting referrals). Dr. Thompson therefore deemed many referrals to be out-of-order referrals when those referrals were in fact not true pass-overs.

In addition, this additional fact contradicts Plaintiff Hyatt's verified interrogatories. All Plaintiffs submitted identical interrogatory responses stating that they could not "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," because "for the most part, the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants have made sure it does not exist." *See supra* ¶ 94 (citing Ex. 47, Hyatt June 2023 Interrogatory Responses, ECF No. 49-47 (No. 21)).

241.     During the 2013 through 2019 time period, a job was assigned to a White member that plaintiff Nalty was qualified for on 23 occasions, even though Nalty was in the referral hall and had a lower reference number than the White member. Thompson Dec., ¶45.

**Defendants' Response:** Disputed. Dr. Thompson's initial analysis of out-of-order referrals (which analyzed Plaintiffs only as a group, not individually) failed to account for numerous relevant variables that affect whether a member receives a referral. *See supra* ¶ 33 (undisputed that

multiple factors affect whether members receive referrals, such as whether member was requested by name, time of day of referral and member's sign in to hall, refusal of referral, certification(s) requested, whether referral occurred after hours, and when work was set to begin); ¶ 109 (undisputed that Dr. Thompson did not consider request by field or comment field, which contain information on factors affecting referrals). Dr. Thompson therefore deemed many referrals to be out-of-order referrals when those referrals were in fact not true pass-overs.

In addition, this additional fact contradicts Plaintiff Nalty's verified interrogatories. All Plaintiffs submitted identical interrogatory responses stating that they could not "Identify all white Local 15 members who you allege received a job that you should have received, and for each member, identify the name of the member, as well as the date, name of the employer, location of the job, and certification(s) requested for each job you allege that member received instead of you," because "for the most part, the information that defendants seek in this interrogatory simply does not exist, and it does not exist because defendants have made sure it does not exist." *See supra* ¶ 94 (citing Ex. 50, Nalty June 2023 Interrogatory Responses, ECF No. 49-50 (No. 21)).

242.    The Union's referral database indicates that there were a total of 18 referrals for "NGA Fusing" or "National Grid Fusing" certifications during the relevant time period, or approximately 0.000874381 of the referrals during the relevant time period. Thompson Dec., ¶48.

**Defendants' Response:** Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

In any event, Defendants are not certain whether Dr. Thompson's calculation referred to in this paragraph is correct but note that the natural gas industry employs workers in other certifications (such as the 7071 certification) not mentioned in this paragraph. Ex. 21, ECF No. 49-21, McNamara Decl. ¶ 15. In any event, the fact alleged in this paragraph is not material. Defendants do not dispute that referrals for work in the natural gas industry are rare; this is because most contractors performing such work rarely seek referrals from the referral hall. McNamara Decl. ¶¶ 13-14.

243.   On October 30, 2017, plaintiff Langford was referred to an off shift forklift job for a major contractor named Skanska USA Civil Northeast ("SUCN") at a work site on 31st Street in Astoria. Off shift means a shift other than the normal day shift, and it pays more than the regular wage. On this job, the hourly pay came to over $100 per hour. Langford Dec., ¶27.

**Defendants' Response**: Undisputed that Plaintiff was referred to a forklift job with Skanska USA Civil Northeast on October 30, 2017, and that off shift work is paid at more than the regular wage.

244.   On November 15, 2017, Langford was moved to cover lights. Lights is the lowest paying job in Local 15's jurisdiction. Langford Dec., ¶28.

**Defendants' Response**: Defendants do not dispute that Plaintiff Langford was moved to cover lights on or around November 15, 2017. Plaintiffs' assertion that lights is the lowest-paid job in Local 15's jurisdiction is disputed. For example, under the wage scale schedule in effect from at the time, the base rate for lights was higher than the base rate for oilers on certain equipment and for engineers on radiant mechanical heaters. 2nd Simon Decl. ¶ 7, Ex. 77, Wage Scale Schedule, July 1, 2017 to June 30, 2018, at Union 8466-69 (light towers regular base rate was $42.73; oilers on certain equipment base rate was $40.36; maintenance engineers on radiant

93

mechanical heaters base rate was $36.22). For purposes of summary judgment, however, this dispute is not material. Defendants acknowledge that the base wage rate for lights is less than the rate for some of the other jobs in Local 15's jurisdiction, including forklift.

245.    Langford was moved to lights by defendant Burns. Burns told Langford that he was moving him to lights because the forklift was being discontinued and lights would be a longer term job. Langford Dec., ¶¶28-29.

**Defendants' Response**: Although Defendants deny the allegations set forth in this paragraph as a matter of fact, for purposes of summary-judgment proceedings, Defendants treat these allegations as undisputed.

246.    The same day, a White member arrived at the worksite to operate the forklift that Langford had been operating. Langford Dec., ¶30.

**Defendants' Response**: Defendants do not dispute these allegations.

247.    The Union's referral records do not show a referral to that worksite for a forklift operator. They do, however, show the referral of a White member to that worksite to operate lights. Thompson Dec., ¶49.

**Defendants' Response:** Defendants do not dispute that the Union's records reflect a referral to the job site on November 15, 2017 for a White member to operate lights, and that there is no referral to the job site that day for a forklift job. The Union's records reflect that the White member referred to that lights job was Brian Lachow. Ex. 78, 2nd Stanton Decl. ¶ 3. Lachow attended the referral hall to look for work on November 15, 2017 and received a referral to lights from Burns. Ex. 79, Lachow Decl. ¶ 6.[8] The referral was to a job remodeling four elevated train

---

[8] Defendants submit this declaration from Brian Lachow as rebuttal to the new testimony from Dr. Thompson and Plaintiff Langford, which Defendants were not aware of when filing our Rule 56.1 Statement. At the time Defendants filed our initial statement, we were aware only of Plaintiff Langford's deposition testimony and interrogatory responses about Langford's switch from forklift to lights, which contradict this new testimony. Specifically, Plaintiff

stations on 31st Street in Astoria. *Id.* ¶ 4. After Lachow received the referral but before Lachow went to work that night, Burns asked him if he could run the Manitou forklift, and Lachow responded that he could; Burns then told him that he might be operating the forklift. *Id.* ¶¶ 6-7. Upon arrival to the jobsite, Lachow began working on the forklift. *Id.* ¶ 8.

> Lachow worked closely with the Laborers on the jobsite while running the forklift:
>
> When I started at the job we were doing demolition. The Laborers were up on a narrow elevator train platform and the forklift was down at street level, with the boom, attachments, rigging, and materials up at the platform level. The forklift Operator did not have a direct line of sight to the platform, so the Laborers had to give hand signals to direct the Operator how to move the boom, attachments, rigging and materials that were being moved by the forklift. A wrong move by the Operator could injure or kill a Laborer up on the platform.

*Id.* ¶ 11. The Laborers told Lachow that Langford had been operating the forklift before he arrived; they had refused to work with him anymore because they were afraid for their safety, as he did not listen to them or follow their hand signals. *Id.* ¶ 12.

248.   Langford was the only lights operator at that job site. Langford Dec., ¶31.

**Defendants' Response:** For purposes of summary judgment proceedings, Defendants do not dispute that Plaintiff Langford was the only lights operator on the job site while he was employed there.

---

Langford testified that a family member of Burns (whose name Langford did not know) came to the jobsite and replaced Langford on the forklift. *See supra* ¶ 101 (citing Langford Tr. 162:14-164:12; Ex. 30, Langford Response to First Interrogatories (No. 8)). Crucially, Langford testified that he overheard this replacement stating that he had come to the jobsite *from another project with Skanska*. *See supra* ¶ 102 (citing 164:13-165:4). In sum, Langford's testimony asserted that a family member of Burns's came to the jobsite from another job with the same employer, not from the referral hall.

Brian Lachow is not related to Burns (or any other member or employee of the Union), and he came to the job from the referral hall, not from another Skanska project. Lachow Decl. ¶¶ 3, 5-6. Indeed, Lachow had not worked for this contractor for several years before being referred. *Id.* ¶ 5. Plaintiff Langford's allegation that he was replaced by Lachow from the referral hall after Lachow received a referral for lights therefore is entirely new testimony that Defendants had no reason to anticipate based on Langford's prior testimony. Defendants therefore should be permitted to reply to this additional fact at this stage of the proceedings. In any event, Defendants reserve the right to move to supplement our Rule 56.1 Statement to include the facts set forth in Lachow's declaration if necessary.

249.    On January 3, 2018, the Union referred another White member to operate a forklift at the Skanska work site in Astoria. Plaintiff was not given the opportunity to return to that machine. Thompson Dec., ¶50, Langford Dec., ¶34.

**Defendants' Response**: Defendants do not dispute that the Union referred a White member to a forklift job at the work site mentioned in this paragraph on January 3, 2018. However, the assertion that Plaintiff Langford "was not given the opportunity to return to" the forklift on January 3, 2018 is disputed to the extent it suggests that the Union denied him such an opportunity, or that Plaintiff Langford was entitled to such an opportunity. Plaintiff Langford did not attend the referral hall on January 3, 2018 and therefore could not have been referred for work that day. Defs.' Ex. 69, Langford Referral Hall Attendance, ECF No. 49-69 at 15 (Langford signed into hall on December 27, 2017 and March 26, 2018, but did not sign in at any time in between those dates). Moreover, Plaintiff Langford did not have any contractual right to return to the forklift. There are limited provisions in the CBA for employees whose machines are taken out of service, but those only apply where the machine is revived within five working days of an employee's layoff. *See* Ex. 5, GCA CBA at Art. IX, Sec. 1, UNION 002857. As noted *infra* at ¶ 250, Langford was laid off on or around the week of December 4, 2017—almost a month before the forklift referral mentioned in this paragraph.

250.    Langford worked the lights job until January 8, 2018, when he was laid off. Langford Dec., ¶33.

**Defendants' Response**: Disputed. Plaintiff Langford has produced paystubs showing that his last week of work with Skanska USA Civil Northeast was December 4, 2017 through December 10, 2017. Ex. 80, Langford Pay Stubs; 2nd Simon Decl. ¶ 8. Plaintiff Langford also has produced his calendars showing that December 8, 2017 was his last day of work; he wrote "Skanska 9pm-

5am Astoria Lights Last Night Laid off" under the entry for that date." Ex. 81, Langford Calendars at P TL 000872; 2nd Simon Decl. ¶ 9. Plaintiff Langford wrote that he had "no work" on every subsequent weekday in December 2017 and January 2018. Ex. 81 at P TL 000873-000882. In addition, this alleged fact contradicts Plaintiffs' own assertion that the Union's stamp-redemption records show 216 hours redeemed for Plaintiff Langford from Skanska Civil USA Northeast. *See* ¶ 252, *infra*. Assuming 8-hour workdays and 5-day workweeks, 216 hours reflects 27 days of work, which is just over five workweeks. This further confirms that if Plaintiff Langford worked continuously for this employer beginning on October 30, 2017, his job ended on or around the week of December 4, 2017—as reflected in the paystubs and in his own calendar entries.

251.    On January 15, 2018, the Union referred a White member to the same job site to operate lights. Plaintiff was not given the opportunity to return to lights at that job site. Langford Dec., Thompson Dec., ¶51, Langford Dec., ¶.

**Defendants' Response**: The assertion that Plaintiff Langford "was not given the opportunity to return to" lights on January 15, 2018 is disputed to the extent it suggests that the Union denied him such an opportunity or that he was entitled to return to the lights job. Plaintiff Langford had not worked on the job since at least December 10, 2017, as shown in response to Plaintiffs' Additional Fact ¶ 250. Plaintiff Langford did not attend the referral hall on January 15, 2018 and therefore could not have been referred for work that day. Defs.' Ex. 69, Langford Referral Hall Attendance, ECF No. 49-16 at 15 (Langford signed into hall on December 27, 2017 and March 26, 2018, but did not sign in at any time in between those dates). In addition, Plaintiff Langford had no contractual right under the CBA to return to the lights job on January 15, 2018 because at that point he had been laid off for more than five workdays. *See supra* ¶ 249.

252.    During the period in question, Langford redeemed stamps representing a total of 216 hours of work from SUCN. Thompson Dec., ¶52.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2).

253.    During the same period in question, the White engineered referred on November 15, 2017 redeemed stamps representing a total of 2,378 hours of work from SUCN. Thompson Dec., ¶53.

**Defendants' Response:** Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this is not material because contractors, not the Union, control the length of jobs, and the Union generally does not know expected job length when referrals are made. *See supra* ¶ 65.

254.    During the same period in question, the White engineered referred on January 3, 2017 redeemed stamps representing a total of 1,273 hours of work from SUCN. Thompson Dec., ¶54.

**Defendants' Response:** Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish

an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this is not material because (1) contractors, not the Union, control the length of jobs, and the Union generally does not know expected job length when referrals are made, *see supra* ¶ 65, and (2) Plaintiff Langford was not even eligible for the January 3 referral, *see supra* ¶ 249.

255.    During the same period in question, the White engineered referred on January 15, 2018 redeemed stamps representing a total of 405 hours of work from SUCN. Thompson Dec., ¶55.

**Defendants' Response**: Plaintiffs cannot support this alleged fact with record evidence because Dr. Thompson's declaration on this point contains new information in violation of Fed. R. Civ. P. 26(a)(2)(B) and therefore should be stricken. *See* ECF No. 51. Plaintiffs cannot establish an undisputed fact where they cannot support their assertions with materials in the record that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)-(2). In any event, this is not material because (1) contractors, not the Union, control the length of jobs, and the Union generally does not know expected job length when referrals are made, *see supra* ¶ 65, and (2) Plaintiff Langford was not even eligible for the January 15 referral, *see supra* ¶ 251.

256.    The business manager of Local 15 is authorized by the Union by-laws to permit members of Local 15-C to perform work within the jurisdiction of Local 15-15A. Exhibit D65, page Union 5390.

**Defendants' Reply**: Plaintiffs' allegation is denied to the extent that Plaintiffs imply that the Business Manager can authorize members of Local 15C to work in Local 15-15A without limitation. Plaintiffs appear to have intended to cite page Union 5394, not 5390 (which does not address the issue they raise). Section 21 of the Union by-laws provides that:

> All members recognize that there are separate and distinct branches of this Local Union. No member shall perform work which falls outside of the branch of this Local Union into which he was initiated without first obtaining clearance from the Business Manager. Such clearance will normally only be granted when there is full employment in the branch in which the manager wishes to be cleared into. However, exceptions to the full employment requirement can be made at the Business Manager's discretion if the member can provide compelling reasons for such clearance and if such clearance will not harm the interests of any other members or the Local Union itself. All members who wish to transfer from one branch of this Local Union to another shall appear before the Executive Board to make such transfer request and the same standards regarding clearance requests articulated earlier in this paragraph shall apply to branch transfer requests.

Ex. 65, Local 15 By-Laws, ECF No. 49-65 at Union 5394 (Emphases added). "Clearance" and "transfer" are different processes—clearance is temporary authorization to perform work within Local 15-15A's jurisdiction, whereas transfer is permanent switching of membership to Local 15-15A. *See* Ex. 82, Callahan Tr. 31:9-33:3 (clearances into 15-15A are sometimes permitted but "if we had welders who were not working…and I knew about it, then we would not allow the clearances," and workers who are cleared in "would be sent back to their…locals" if unemployment in 15-15A later became high); Ex. 4, ECF No. 49-4, Callahan Decl. ¶ 12 ("A 15C member who wanted to become a permanent member of 15-15A would have to request to transfer to 15-15A."). The Business Manager can authorize clearance in certain limited circumstances, but the Executive Board ultimately must approve transfer requests, as provided in Section 21.

Although Plaintiff Kennedy claims that he asked Business Manager Tom Callahan "for permission to obtain work from the referral hall," *see infra* ¶ 258, Kennedy does not allege that he asked Callahan for permission to transfer *permanently* to Local 15-15A. Kennedy also does not dispute that he never appeared before the Executive Board to request transfer. *See supra* ¶ 172.

257.    Plaintiff Kennedy requested his business agent, Michael Salerno, to help him transfer to Local 15, 15-A. Mr. Salerno never told him he needed to make his request to the Executive Board. Kennedy Dec., ¶¶2-3.

**Defendants' Reply**: For purposes of summary-judgment proceedings, Defendants do not dispute the allegations in Plaintiffs' Additional Fact ¶ 257.

258.    Kennedy requested the business manager, defendant Thomas Callahan, for permission to obtain work from the referral hall. Callahan was rude and belittled Kennedy's work experience. Kennedy Dec., ¶4

Defendants' Reply: Defendants do not dispute that Callahan once informed Plaintiff Kennedy that he could not obtain work from the referral hall because he was a Local 15C member. Defendants deny that Callahan was "rude" to or "belittled" Plaintiff Kennedy; in any event, these vague allegations about Callahan's manners are not material to the present case.

Dated: August 31, 2023

Respectfully submitted,

/s/ Jennifer R. Simon

Jennifer R. Simon
Michael A. Gillman
April H. Pullium
O'DONOGHUE & O'DONOGHUE LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC 20015
Telephone: (202) 362-0041
Facsimile: (202) 362-2840
jsimon@odonoghuelaw.com
mgillman@odonoghuelaw.com
apullium@odonoghuelaw.com
